UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------X
RONALD BRYSON,

                         Petitioner,

**OPINION & ORDER**
**CV-11-0749 (SJF)**

     -against-

MICHAEL SHEAHAN[1], Superintendent of
Five Points Correctional Facility,

                      Respondent.

FILED
IN CLERK'S OFFICE
U S DISTRICT COURT E D N Y

★ OCT 01 2013 ★

LONG ISLAND OFFICE

-------------------------------------------------------X
FEUERSTEIN, J.

## I.    Introduction

On June 23, 2006, a judgment of conviction was entered against petitioner Ronald Bryson ("petitioner") in the Supreme Court of the State of New York, Suffolk County (Mullen, J.) ("the trial court"), upon a jury verdict finding him guilty of one (1) count of murder in the second degree (N.Y. Penal Law § 125.25(3) (felony murder)), two (2) counts of burglary in the first degree (N.Y. Penal Law §§ 140.30(2) and (3)) and one (1) count of assault in the first degree (N.Y. Penal Law § 120.10(4)), and imposition of sentence. On February 8, 2011, petitioner filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C § 2254. For the reasons set forth below, the petition is denied.

---

[1] The Clerk of the Court is directed to amend the caption of this action to reflect the current Superintendent of Five Points Correctional Facility.

II.  Background

   A.  Factual Background

      1.  People's Case

         a.  The Burglary Plan

On direct examination, Wanda Santalis ("Santalis") testified that in April 2004, she lived in her grandmother's house on Hickory Street in Central Islip, New York with her cousins, Marisa, Rosa and Michelle Casillas ("Casillas"); Rosa's boyfriend; petitioner; and Stanley Williams ("Williams"). (T3. 113, 115-17, 119-20)[2]. According to Santalis, petitioner was a "friend of the family" she had known for eight (8) or nine (9) years and had been living with Casillas at their grandmother's house for approximately three-and-a-half to four (3½-4) weeks. (T3. 116, 120). Santalis testified that petitioner, who she identified in court, was also known by the nickname "Ramanadie." (T3. 117).

Casillas, who appeared in court pursuant to a subpoena, (T3. 22), testified that in April 2004, she was living at her grandmother's house at 55 Hickory Street in Central Islip with Santalis. (T3. 19, 23). When asked if Williams also stayed at the house, Casillas testified that "[h]e used to come over occasionally." (T3. 21). According to Casillas, she knew petitioner, whom she identified in court, "for years" and they were friends. (T3. 19-20). When asked if petitioner was staying at her grandmother's house around the time of Carter's murder, Casillas testified that "[h]e used to come around occasionally but that was it." (T3. 22, 24-25). When asked if petitioner ever stayed overnight at her grandmother's house, Casillas testified that she

---

[2] References to the transcript of the proceedings on May 31, 2006 are cited as "(T3.)"

2

did not know "because he never slept in [her] bed." (T3. 24). When asked if petitioner slept in someone else's bed at her grandmother's house, Casillas responded: "I don't know. It's a big house." (T3. 24).

Santalis testified that on the night of April 26, 2004, petitioner, Williams and William Brewster ("Brewster"), with whom she had been friends since elementary school, (T3. 117-18), were "hanging out, smoking, talking" and "rapping about a gun, a bat and a knife," (T3. 130), while sitting in her car parked in front of her grandmother's house. (T3. 129-130). Santalis was also in the car at times, but was traveling "back and forth in and out of the house." (T3. 130).

Santalis testified that around midnight on April 26, 2004, into the early morning hours of April 27, 2004, Williams asked her to drive him around the corner "to go rob Eric [Shawn Carter ('Carter')]," (T3. 131-32, 134), with whom she had been "messing around" since February 2004, (T3. 120-21, 169-72), which she agreed to do. (T3. 132, 134). According to Santalis, she did not see whether the men had any weapons, (T3. 133), but she had a silver metal bat with a black top in the car, (T3. 133-34). Santalis found out the next day that the three (3) men did have weapons on them when they went to rob Carter. (T3. 133). Santalis testified that all of the men were wearing hooded sweatshirts, gloves, dark clothing and fitted baseball caps; two (2) of the men were wearing bandanas around their mouths; and the other man was wearing a black ski mask. (T3. 132). After Santalis agreed to drive them, Williams directed her "to drive two blocks away from Tamarack the opposite way from Hickory." (T3. 135). Once she was told to stop driving, the three (3) men exited her car and ran behind it. (T3. 135).

On cross-examination, Santalis was questioned extensively about prior inconsistent statements she made during a May 5, 2005 interview with Detective Susan Nolan ("Nolan") and

3

Detective Richard Higgins ("Higgins") and repeatedly testified that she did not remember making those statements, even after she reviewed the written statement that she had signed following that interview. (T3. 159-68).

b. The Burglary

Monica Dudley ("Dudley") testified that on April 27, 2004, she stayed with Carter, with whom she had a four (4) month old son at the time and was pregnant with a second child, at his house at 32 Tamarack Street, Central Islip, New York ("Carter's house"). (T3. 54-56). In April 2004, Robert Arbaiza ("Arbaiza") was also living with Carter, (Dudley: T3. 54; Arbaiza: T3. 88-89), because he had been evicted from his former residence in December 2003. (Arbaiza: T3. 89). At that time, Arbaiza had been briefly dating Katy Ventura ("Ventura"). (Arbaiza: T3. 89; Ventura: T3. 28-30).

Dudley testified that on April 27, 2004, at approximately 12:30 to 1:00 a.m., she was in bed with Carter and their son in Carter's bedroom, which was the first room in the house to the left upon entering the front door, when she heard a "loud boom" in the direction of the front door. (T3. 55-57). Both Dudley and Carter sat up in the bed and Dudley saw two (2) men enter the room. (T3. 57-58). According to Dudley, upon entering the bedroom, the men immediately jumped on the bed and one of them started hitting Carter in the face and head with a gun. (T3. 58). The other man had a bat. (T3. 58-59). Dudley jumped on top of her baby in the bed because the two (2) men "were just going crazy in the room," (T3. 58); heard someone in the hallway yell: "he has backup;" and saw the man with the bat run out of Carter's bedroom. (T3. 59). Arbaiza and Ventura were then dragged into Carter's room. (T3. 59).

4

Just before 1:00 a.m. on April 27, 2004, Arbaiza and Ventura were sitting on the couch in the living room of Carter's house watching television. (Arbaiza: T3. 89-90; Ventura: T3. 29-31). Arbaiza testified that he got up to change the channel, saw the front door being kicked in and heard a "bang." (T3. 90-91). Ventura testified that she heard "[a] crashing noise and then three [3] guys just ran inside the house and each of them had a weapon in their hand. One of them had a knife, the other one had a gun and the other one had a bat." (T3. 32). Arbaiza then walked towards Carter's room. (Arbaiza: T3. 91; Ventura: T3. 32). According to Arbaiza, Carter's bedroom door was open and he saw people in the bedroom and a "commotion." (T3. 91). Then another man entered Carter's house through the front door and Arbaiza grabbed that man, whom he described as being a black male with dark skin, and pinned him against the wall in the hallway. (Arbaiza: T3. 91-92, 107-08). According to Arbaiza, the man, who had a knife, started yelling to the other people in the house that "there was more people in the house." (T3. 92). Arbaiza testified that as he lifted the man on the wall, he was stabbed in the back, then he started getting hit with a baseball bat. (T3. 92, 108). According to Arbaiza, he was stabbed in the back four (4) times with a "long kitchen knife-type" with a single blade. (T3. 93). Ventura testified that she saw Arbaiza get stabbed in his back three (3) times with a five to six inch (5-6") straight knife, then he fell to the floor. (T3. 32-34). According to Arbaiza, he fell to the floor after he was hit with the bat, then he tried to get back up and was dragged into Carter's bedroom, where Carter was with his girlfriend and baby, by the men with the knife and bat. (T3. 92-95, 108).

Dudley testified that after Arbaiza was dragged into Carter's room, the perpetrators put him against the wall closest to the door and she saw that he was bleeding. (T3. 59). According to Dudley, there were now three (3) perpetrators in Carter's bedroom. (T3. 59-60). Arbaiza

5

testified that upon entering Carter's bedroom, he saw a third man who had a gun pointed on Carter, who was in the corner of the bedroom with Dudley next to him. (T3. 95, 105, 109). According to Arbaiza, Ventura was brought into Carter's bedroom after him and was thrown behind Dudley on the left side of the bed. (T3. 95).

Ventura testified that after Arbaiza was stabbed, the man with the knife approached her, asked her what her name was and said "calm down, mama, and just stay there," which she did. (Ventura: T3. 34). The man with the knife then returned to where Arbaiza and the other two (2) men were and "the tallest guy, the one holding the gun" called Ventura over to them. (Ventura: T3. 34). After Ventura walked over to the men, one of them pushed her towards Carter's bedroom. (Ventura: T3. 35).

Ventura testified that upon entering Carter's bedroom, she had been facing a wall, but when she turned around she saw Carter on the bed and being hit repeatedly with a bat; Arbaiza on the floor near the closet in the bedroom and bleeding; and Dudley and a baby on the bed with Carter and covered with the sheet. (T3. 35-37, 42, 46-49). The man holding the gun then punched her in the face. (T3. 36). Arbaiza testified that "people" were yelling, screaming and "going through stuff," (T3. 95, 108), and that he saw Carter getting hit in his upper body with the bat. (T3. 95). The perpetrators were screaming about wanting money and drugs, while they continued to hit Carter with the bat. (Ventura: T3. 37; Arbaiza: T3. 95-96). Ventura testified that she eventually heard Carter said: "Okay, that's fine," (T3. 37), then Dudley got off the bed, told her to move so she could get to the baby's bag, grabbed the baby's bag and handed it to one of the perpetrators. (T3. 37). According to Ventura, when the perpetrators emptied the contents of the bag onto the floor and did not find anything, they continued hitting Carter with the bat and

6

threatened to kill his "wife" and baby. (T3. 37-38). According to Dudley, the perpetrators threatened to stab her and "beat" her son after Carter gave them "everything he had," i.e., money and crack, because they did not believe him. (T3. 60-61). Dudley testified that the man with the gun said: "You're living too good. You're living too good. Where is the rest of it at?" (T3. 60). According to Dudley, the man with the gun did most of the talking and continued to hit Carter with the gun while he was talking. (T3. 60).

After the perpetrators threatened Dudley and her baby, Carter got up and attacked them. (Ventura: T3. 38; Dudley: T3. 61-63; Arbaiza: T3. 96-97). According to Dudley, Carter had heard the gun click and "knew there were no bullets" in it before he punched the man with the gun in the face. (T3. 62). Carter started fighting with all of the perpetrators, winding up outside of the house, and was stabbed during the fight. (Ventura: T3. 38-40; Dudley: T3. 63; Arbaiza: T3. 97-98). According to Ventura, Carter was stabbed with the same knife used to stab Arbaiza and by the same man who stabbed Arbaiza. (T3. 38-40). Dudley testified that before the fight started, the man with the bat had taken her son's piggy bank and that she heard the piggy bank drop in the hallway by the front door as the fight progressed outside. (T3. 63-64, 68-71).

After Carter and the perpetrators left the bedroom, Arbaiza started to complain that he was losing a lot of blood, so Ventura went over to him. (Ventura: T3. 40; Arbaiza: T3. 98-100). Dudley testified that once the perpetrators went outside, she went looking for a telephone to call 911, then she went outside to see Carter. (T3. 64). According to Dudley, when she went outside, the perpetrators were gone and she saw Carter on the end of the driveway, "bleeding out his back" and still alive, but not talking. (T3. 64-65). According to Ventura, Dudley headed outside, started screaming, then came back inside and said: "They killed him. They killed him." (T3.

7

40). Arbaiza then got up, grabbed his cell phone from the living room and called 911. (Ventura: T3. 40-41; Arbaiza: T3. 98-99).

Arbaiza testified that after he called the police, he "was falling asleep" when he heard a walkie-talkie, at which point he woke up and shouted to the cop that he was in the room. (T3. 100). According to Arbaiza, he asked for help to stop the bleeding and told the cops that he had been bleeding for awhile. (T3. 100). The paramedics arrived shortly thereafter, cut off his clothes, put him on a stretcher and took him to Southside Hospital. (T3. 100). According to Arbaiza, all four (4) stab wounds in his back required staples, he had a "postconcussion" from being hit in the head with a bat, his arm was bruised and he could not "use half [his] shoulder" from being hit with the bat, he had a punctured lung and "there was something wrong with [his] kidneys * * * as a result of being stabbed." (T3. 101, 103). Arbaiza remained hospitalized for three (3) days and the staples were removed after two (2) weeks, at which time the doctor also noticed a chipped bone in his shoulder. (T3. 102). According to Arbaiza, he has four (4) permanent scars on his back from the stab wounds. (T3. 103).

c.   The Descriptions of the Perpetrators

Ventura testified that all of the men who entered Carter's house were wearing "hoodies" with the hoods up and had bandanas covering their faces from the nose down, but she could see from around their eyes that they were black males. (T3. 43-44). Ventura also testified that the man with the knife was the shortest of the three (3) men. (T3. 45).

Dudley testified that two (2) of the men were wearing black "hoodies" and the other was wearing a gray "hoodie;" that two (2) of the men were wearing red bandanas over their faces and

the other was wearing "a ski mask just to cover the bottom of his face;" that all of the men were wearing gloves; and that she could tell from around the men's eyes that they were all black. (T3. 58, 66-67). Dudley also testified that the man who had the knife was "short and dark;" the man who had the bat was "tall and light;" and the man who had the gun was "just in between the other two size-wise" and had "a nice complexion." (T3. 67).

On cross-examination, Dudley testified that in her prior statement to police on May 4, 2004, she had said that on April 26, 2004, Carter had gone with Kendall Toussant ("Toussant"), one of his friends, to pick up some crack cocaine. (T3 80-81). Dudley testified that Toussant has "nice skin" and hazel-type eyes and is "Haitian, black." (T3. 81-83). Dudley further testified that during her grand jury testimony and statements to police, she had indicated that the perpetrator with the gun had a nice complexion and hazel-colored eyes. (T3. 82). On redirect examination, Dudley testified that Toussant is shorter than petitioner and closer to the size of the man who had the knife. (T3. 85).

Arbaiza testified that the shortest man had stabbed him and that the tallest man had held the bat. (T3. 93, 95). Arbaiza also testified that the black male with dark skin who he initially pinned to the wall was wearing a bandana to cover some of his face, although he could see the man's eyes. (T3. 92). According to Arbaiza, all of the perpetrators were wearing bandanas and hooded sweatshirts, but he was able to see from around their eyes that they were black males. (T3. 104).

Santalis testified that Williams was the shortest and had the darkest skin tone of the three (3) men. (T3. 143).

Detective Douglas Mercer ("Mercer"), one of the homicide detectives assigned to

investigate Carter's death, testified that Williams is "very short," standing about five feet seven inches (5' 7") tall, and has "extremely dark" skin tone; that Brewster is the tallest of the three (3) men, standing about six feet one inch (6' 1") tall, and has the lightest skin tone of the three (3) men; and that petitioner is between five feet eleven inches (5' 11") and six feet (6') tall and is in the middle with respect to skin tone. (T5. 15, 26-27).[3]

### d.    Flight

Santalis testified that while she was waiting for the three (3) men to return to her car, she sat in the car, which was parked on the corner of Magnolia and Boulevard, with the motor running. (T3. 137-38). According to Santalis, when the men returned to the car, they were running, screaming and yelling for her to drive. (T3. 136, 138). Santalis described the first five (5) minutes following the men's return to the car as "chaos," (T3. 139), and testified that Williams said that he had stabbed someone and that "he thought he caught a body," and that petitioner said that "he beat the shit out of someone." (T3. 136, 139). When Santalis was asked to describe what "caught a body" meant, she testified that Williams "thought he killed someone." (T3. 136). According to Santalis, Brewster told her to get on the highway and drive him to Mastic. (T3. 136, 138). During the drive, the three (3) men threw their clothing and hats out of the window of Santalis's car. (T3. 139-40).

Santalis testified that after she dropped Brewster off in Mastic, she returned to her grandmother's house with Williams and petitioner, at which time Williams told her that they would know if someone died the next morning if there was yellow tape around the area. (T3.

---

[3] References to the transcript of the proceedings on June 2, 2006 are cited as "(T5.)"

140-41). According to Santalis, she and Williams woke up early the next morning to go to the store and saw yellow tape around Carter's house. (T3. 141).[4]

On cross-examination, Dudley testified that in April 2004, she knew Santalis because she "kept hanging around" and was "obsessed with" Carter, and because Santalis was having a romantic relationship with him. (T3. 76-79). According to Dudley, she had even had a physical altercation with Santalis at Carter's house, following which Santalis did not return to Carter's house. (T3. 78-79).

### e.    The Investigation

On April 27, 2004, Police Officers Frank Abramowitz ("Abramowitz") and John Connors ("Connors") responded to a radio run at approximately 1:01 a.m. about a robbery with possible injured victims at 32 Tamarack Street in Central Islip, New York. (Abramowitz: T2. 47-48; Connors: T2. 71-73)[5]. Upon arriving at that location approximately two (2) minutes later, (Abramowitz: T2. 48-49), the officers observed a black male lying prone in the driveway and bleeding and a black female, whom Connors later learned was Dudley, (Connors: T2. 78-79), standing next to him, screaming and asking for an ambulance. (Abramowitz: T2. 49-50, 59-60; Connors: T2. 73).

---

[4] Santalis testified that in May 2005, she was arrested and charged with murder in the second degree, assault in the first degree and two (2) counts of burglary in the first degree in connection with this incident. (T3. 125). Santalis further testified that she entered into a plea agreement, pursuant to which she agreed to plead guilty to burglary in the first degree and would be sentenced to a determinate term of imprisonment of seven (7) years in exchange for her truthful testimony. (T3. 128-29, 173-75).

[5] References to the transcript of the proceedings on May 30, 2006 are cited as "(T2.)"

After calling an ambulance for Carter, (Abramowitz: T2. 53), Abramowitz entered the house, (Abramowitz: T2. 51; Connors: T2. 74). Abramowitz testified that he saw a female, who he later learned was Ventura, right by the front door. (T2. 51). As a result of his conversation with Ventura, Abramowitz went into the bedroom "in the front portion of the house to the left of the front door," where he saw a male calling for help. (Abramowitz: T2. 52-53). Abramowitz testified that the man, who he later learned was Arbaiza, was face down on the floor and bleeding. (T2. 53-54). Abramowitz testified that he then called for a second ambulance to assist Arbaiza. (T2. 53).

Connors testified that after Abramowitz discovered Arbaiza, he briefly entered the house "to make sure that it was safe in there." (Connors: T2. 74). Connors testified that Arbaiza was in the first bedroom on the left and had been stabbed, was hunched over and was asking for rescue. (T2. 75). Once the officers ascertained that the house was safe, Connors returned to Carter in the driveway. (T2. 75-76). According to Connors, Carter was bleeding "a lot" from the abdomen, moaning and unable to speak. (T2. 76).

According to both officers, the house looked ransacked, there was blood around the house and the front door had been kicked in, as a result of which the door jamb was "blown" and the lock was on the floor. (Abramowitz: T2. 50-53, 58, 61-62; Connors: T2. 74-75). Both officers testified that they received information, including a description of the perpetrators, from Dudley and Ventura at the scene, (Abramowitz: T2. 54 (Ventura) Connors: T2. 78 (Dudley)), which was broadcast over the police radios. (Abramowitz: T2. 54-55; Connors: T2. 79).

At approximately 2:25 a.m. on April 27, 2004, Detective Michael Degennaro ("Degennaro") was notified that a death had occurred at 32 Tamarack Street and that the

12

Homicide Squad had requested him to respond to the scene. (T2. 93-94).

Peter Tracy ("Tracy"), who is employed by the Suffolk County medical examiner at the Suffolk County Crime Laboratory, (T2. 136), testified that upon arriving at the scene at approximately 3:30 a.m., (T2. 141-42), he received information about "an altercation inside the residence that ended up coming out to the exterior of the house and out to the driveway. And the body was removed by ambulance to the hospital at that time so there was no body at the scene." (T2. 143-44).

Upon arriving at the scene at approximately 4:05 a.m., (T2. 95), Degennaro spoke with two (2) homicide detectives to get an overview of what had transpired, (T2. 96), then he; his partner, Detective Heinssen ("Heinssen"); the two (2) homicide detectives; and two (2) forensic scientists, including Tracy, did a "walk-through" of both the interior and exterior of the home at 32 Tamarack Street to determine if there was "any obvious evidence." (Degennaro: T2. 96-98; Tracy: T2. 144). Upon entering the house, Degennaro observed "a large amount of coins strewn about;" a ceramic piggy bank "broken into numerous pieces in the foyer;" numerous "red stains" throughout the house, including "large area[s] of red staining" at the end of the driveway and on the wall "through the hallway toward the living room," red staining on the walls on both sides in the foyer and "several large areas of stain" in the master bedroom and leading to the master bedroom; a hat in the entrance foyer; and "a lot of clothing and things strewn about the scene." (T2. 98-99, 102, 109, 117-29, 131-34). Tracy observed a stain at the end of the driveway and "blood staining" going from the foyer down the hallway and in the bedroom to the left. (T2. 144-46, 150-51). Following the "walk-through," DeGennaro accompanied Heinssen as he videotaped, then photographed, the scene "to show the scene exactly as [they] [found] it." (T2.

13

Tracy testified that once the photography was completed, the crime laboratory team, including himself, entered the scene to find "items of evidence" for the investigation, which were tagged, photographed, collected, secured and brought back to the lab for analysis. (T2. 146-47). In addition, Tracy took "rough" interior measurements of the residence and each particular item of evidence to enter into a computer program and create a computer diagram. (T2. 147-48). Tracy testified that besides the "question stains," the following items of evidence were collected from the scene: a baseball cap found at the end of the hallway in an area where "question stains" were found on both walls and the floor; a razor blade found on top of a stereo speaker in the living room; a "defect" in the sheetrock wall which appeared "fresh" since it had no dirt or cobwebs in it; two (2) sets of clothing; a pillow case; and a buccal[6] swab from Dudley (T2. 151-55; T3. 4-14). In addition, a glove was recovered on a "grassy area" on Boulevard Avenue, the cross street "just east of Tamarack Street" that runs north/south. (Degennaro: T2. 129; Tracy: T2. 155-56; T3. 5, 14-16). According to Tracy, all of the items of evidence were photographed in the location from which they were recovered before they were removed from the scene. (T2. 158).

Degennaro testified that the last thing he did at the scene was to dust the front door, the entire walls of the foyer, "the entire master bedroom including all the items that were in the master bedroom" and the exterior side of one of the master bedroom windows for fingerprints, but no identifiable fingerprints were developed. (T2. 103-05). Before leaving the scene,

---

[6] A buccal swab is a swab from inside a person's mouth that is used for colleting DNA samples. (Galdi: T4. 120).

Degennaro recovered the ceramic piggy bank pieces to attempt to develop fingerprints, (T2. 103), but no identifiable fingerprints were developed from that item either. (T2. 107-08).

Detective Joseph Galdi ("Galdi"), the supervisor of the biology section of the Suffolk County Crime Lab, (T4. 113)[7], testified that he received a glove and a baseball cap relating to this case; buccal swabs from Arbaiza and Dudley; and a blood sample from the deceased Carter, (T4. 117-18, 120-21, 125), and that Robert Baumann, a member of the biology section of the Suffolk County Crime Lab who Galdi supervised, (T4. 117), whose work he reviewed in this case, (T4. 120, 126), received buccal swabs from petitioner, Williams and Brewster, (T4. 121). Galdi testified that upon visual inspection of the cap, he observed four (4) areas of "brown staining" that "appeared to be blood," one located on the underside of the bill of the cap, another located on the outside of the cap "but adjacent to where the sweatband would be on the [cap]," and two (2) others on the top of the cap. (T4. 123). Upon inspection of the glove, Galdi observed no obvious staining. (T4. 124). Upon testing, Galdi determined that the two (2) stains on the top of the cap were not bloodstains, but that the other two (2) brown stains were, in fact, bloodstains. (T4. 123-24). According to Galdi, Baumann was able to get a DNA profile from the two (2) bloodstains on the cap, but not from a swab of the glove. (T4. 126). Galdi testified that, based upon a comparison of the DNA profiles from the buccal swabs and blood sample and the DNA profiles from the bloodstains on the cap, Carter's DNA profile matched the DNA from the underside of the bill of the cap, and was a possible source of the mixture of DNA recovered from the sweatband of the cap, and Williams "was included as being a possible part of the mixture of

---

[7] References to the transcript of the proceedings on June 1, 2006 are cited as "(T4.)"

DNA found in the sweatband of the [cap]," i.e., on "the inside of the cap * * * touching the forehead of the person that would be wearing it." (T4. 128-29). Dudley, Arbaiza, petitioner and Brewster were excluded as sources of any of the DNA found on the cap. (T4. 128).

On April 27, 2004, Dr. James Wilson ("Wilson"), a deputy medical examiner employed by the Health Department of Suffolk County, (T4. 139), performed an autopsy on Carter, (T4. 143), during which he observed multiple injuries on Carter's face, torso and right lower leg, including: (a) two (2) shallow "cuts" in the face region that were created by something with "a sharp edge," like a knife, (T4. 146-47); (b) five (5) stab wounds on Carter's back, i.e., one behind the left armpit that extended into the left chest cavity and "cut at the surface of the left upper lung lobe," (T4. 149, 152), three (3) "prominent" ones on the right side, (T4. 149-50, 166-67), one of which extended into the right side of the chest and cut through the upper part of the lung, another of which "projected into the right chest through the lower part of the right lung" and cut a hole in the side of the "very large vein bringing blood from the lower part of the body into the right side of the heart" that opened into the right chest cavity, (T4. 153), the third of which "also penetrated deeply * * * with some involvement of the bones of the posterior part of the spine and ended in fatty tissue below the left kidney without creating a serious injury to a major internal organ or large blood vessel," (T4. 153-54), and each of which "gave [him] evidence" that it was created by a single-edged knife with a blade in the range of five to six inches (5-6"), (T4. 150, 158-59), and one (1) "just above the right buttock * * * that went right down to the bone of the pelvis or sacrum," (T4. 150, 154); (c) a "three inches maximum diagonal oval bruising mark with a pale center that had red-purple around the edges to blue discoloration" on the left side of Carter's back in the flank region that is "classical for something like a baseball bat impacting the surface

16

of the body," (T4. 151, 160, 165-66); (d) a laceration or tearing wound beside the left eye that

extended down to the bone beside the eye, (T4. 147, 164), and bruising and crushing of tissue on

and just behind the "left external ear," (T4. 147-48, 164), both of which "could have been caused

by a gun being used to impact the head," (T4. 160, 164), and (e) an injury to the back of Carter's

right hand that was consistent with "an effort to block a blow or 'defense wound[.]'" (T4. 151-

52). Wilson determined that the stab wounds to Carter's torso were "deep and penetrating" and

would have "bled immediately," even more so during a struggle, and concluded that the cause of

Carter's death was "stab wound of the torso" and the manner of Carter's death was homicide.

(T4. 156-57).


### f.    Admissions

Maurice Bidot ("Bidot") testified that he is petitioner's cousin and knows him to have the

nicknames "Nadie" and "Ramanadie." (T4. 11). Bidot identified petitioner in court. (T4. 11).

According to Bidot, in October and November 2004, and January 2005, he had a number of

conversations with petitioner about Carter's murder. (T4. 12-13, 15). Petitioner told Bidot that

he and two (2) of his friends "went to go do a robbery" in Central Islip; that during the course of

the robbery, he noticed that "one of the guys he was with was punching a dude but then he

noticed he wasn't just punching the guy he was stabbing the guy and blood was all over the place

and stuff;" that he later heard that the man he had seen being stabbed had died; that he believed

one of the other men had set up the robbery as a personal vendetta because Carter was "messing

with his girl, his girlfriend, something like that;" that the three (3) men had brought an unloaded

gun, a knife and a bat to Carter's house; that Carter was also hit with the bat; that Carter "almost

17

got away;" and that Carter's girlfriend and a baby were also in the house. (T4. 13-16). According to Bidot, petitioner did not tell him the names of the two (2) other men that had gone with him to do the robbery in Central Islip. (T4. 14, 18).

Bidot testified that he also recalled having a conversation with petitioner during which petitioner indicated that he was nervous that the police were going to charge him and that "[h]e wanted his girl to be his alibi for that time." (T4. 17-18). According to Bidot, he received no promises or any consideration in return for his testimony against petitioner. (T4. 19). On cross-examination, Bidot testified that he first reached out to the police about his conversations with petitioner after he was arrested on drug charges in November 2004, for which he faced a potential sentence to a term of imprisonment of nine (9) years. (T4. 30, 32-33). Bidot pled guilty to reduced charges with respect to the November 2004 drug charges and was sentenced to a term of imprisonment of one (1) year. (T4. 37-38, 42).

After Bidot informed the police about his conversations with petitioner and "agreed to wear [a] wire," he was subsequently arrested for criminal possession of marijuana; criminal possession of a weapon, for which he faced a potential sentence to a term of imprisonment of seven (7) years; and criminal sale of a controlled substance. (T4. 34-35, 37). The gun charge was dismissed for lack of evidence, (T4. 35-37), and the sentence imposed upon Bidot's conviction for the subsequent criminal sale of a controlled substance charge ran concurrent to the sentence imposed upon his conviction relating to the November 2004 drug charges, so he served no additional time with respect to any of the additional charges against him. (T4. 38-39). On redirect examination, Bidot testified that after his arrest on the subsequent charges, he was told by the district attorney that he would not receive any consideration for those arrests because they

18

were new arrests and that, in fact, he did not receive any consideration from the district attorney's office with regard to his plea on any of the charges for which he was sentenced to a term of imprisonment of one (1) year. (T4. 44-45).

On cross-examination, Bidot testified to wearing a wire and attempting to get petitioner to talk about Carter's murder on two (2) occasions. (T4. 43).

On January 10, 2005, Mercer and Detective Higgins ("Higgins") met with Bidot at police headquarters in Yaphank to place a recording device on him and have him talk to petitioner. (Mercer: T5. 16-17). Mercer testified that the recording device enabled the detectives to listen to and record the conversation between Bidot and petitioner "in real time." (T5. 17). According to Mercer, at approximately 11:30 a.m., he drove Bidot to Mastic Boulevard in Mastic and watched him enter a house at 76A Mastic Boulevard, which was where Bidot had indicated that petitioner lived. (T5. 18). After Bidot entered the residence, Mercer and Higgins parked their vehicle several houses away, stayed in their vehicle and listened to any conversation between Bidot and petitioner. (T5. 18-19).

Mercer testified that at about 1:30 p.m., he overheard a conversation relating to the investigation of Carter's murder, so he continued to listen to that particular conversation and to monitor Bidot's actions for an additional period of time. (T5. 20-21). According to Mercer, at approximately 2:00 p.m., he witnessed Bidot come out of the house with petitioner, (T5. 21), at which time he was able to hear their further conversation, to recognize Bidot's voice and to recognize petitioner's voice as being the same voice to which he heard Bidot talking within the house. (T5. 22).

Mercer testified that shortly after 3:00 p.m., Bidot returned to the detectives' vehicle and

they drove him and the tape recordings of his conversations with petitioner back to police headquarters. (T5. 23). According to Mercer, upon reviewing the tape recordings, he ascertained that the quality of the tapes is "extremely poor," i.e., there is a lot of static and the voices are low at times, and that it would be "extremely difficult" for the jury to discern what was being said on them. (T3. 25).

Marcus Glover ("Glover") testified that he knew Bryson for five (5) years by his nickname, "Ramanadie," and identified him in court. (T4. 53-54, 57-58). Glover also knew Williams, whom he described as his best friend, (T4. 54-55, 57-58); Santalis and Brewster, both of whom he knew for years from the neighborhood, (T4. 55-58, 69); and Carter, whom he had known for four (4) years. (T4. 58-59, 69). Glover testified that after he found out that Carter had died, he asked Santalis and Williams what had happened to him. (T4. 59). After his conversation with Santalis and Williams, Glover spoke with petitioner, who told him: "[T]hey went to go rob [Carter] and it turned out that he got stabbed and he left." (T4. 59-62). Glover testified that petitioner also told him that he, Williams and Brewster had attacked Carter in order to rob him of money and because of his relationship with Santalis; that he had brought a gun that did not work, Brewster had brought a bat and Williams had brought a knife; that the three (3) men wore masks; that Carter's girlfriend, baby and friend were also in Carter's house; that Santalis drove them to Carter's house; and that after they left Carter's house, they ran, got into the car and went different places. (T4. 62-63).

According to Glover, he went to the police in December 2004 to tell them about his conversation with petitioner because he hoped to receive some consideration with respect to drug sale charges pending against him, although he was not promised anything with regard to that.

(T4. 64-65, 92, 98).  Glover also testified that on December 28, 2004, he had been arrested on charges of criminal contempt in the first degree and robbery, at which time he gave written statements to the police regarding his conversations with Bryson, Santalis, Williams and Brewster.  (T4. 67-68).

### 2.    The Defense

Nolan testified that she and Higgins interviewed Santalis on May 5, 2005 for about three (3) hours, beginning at 9:21 a.m., and that prior to any questioning, Santalis was read her Miranda rights and agreed to waive them, including her right to have an attorney present.  (T5. 46, 50-52).  According to Nolan, Santalis made the following statements during the interview:

> "I didn't have shit to do with him getting killed[;]"

> "I don't know what happened in there[;]"

> "[Petitioner], I lent my car to him.  He was going to go rob [Carter].  It was just [petitioner][;]"

> "I gave him [referring to petitioner] my car, a Mitsubishi Diamante.   It got repossessed[;]"

> "He had the car from that time till [sic] the next day.  The next morning I found out who he robbed and it was murder.  He came to my house.  He said he went in there.  He said he beat the shit out of him.  I was home with my man[;]"

> "I don't know where [Williams] was when [petitioner] came back that night.  That night around 2:30 I was asleep[;]" and

> "When [petitioner] came home, he told [Casillas] what happened.  [Casillas] told me what happened."

(T5. 47-50).

On cross-examination, Nolan testified that those statements were made during the first

21

thirty-five (35) minutes of the interview, (T5. 55); that Santalis initially attempted to minimize her involvement in Carter's murder, (T5. 52-53); that it appeared to her that there were other individuals Santalis was trying to protect, (T5. 53); and that the "tone" of the interview changed after the first thirty-five (35) minutes, which was followed by a fifteen (15) minute break. (T5. 55). According to Nolan, it is very common for individuals she interviews to attempt to minimize their involvement in the crime that they are discussing. (T5. 53-54).

Nolan also testified on cross-examination that the above statements "were not just continuous statements that [Santalis] was just making uninterrupted" and that sometimes she would give full sentences, but sometimes she would give one (1)-word answers in response to the conversation they were having. (T5. 54).

Detective Robert Flood ("Flood") testified that he prepared an arrest worksheet on petitioner and that the pedigree information on that arrest worksheet indicates that petitioner is black, non-Hispanic, five feet eleven inches (5' 11") tall and has brown eyes. (T5. 64-65). On cross-examination, Flood testified that he prepared that portion of the arrest worksheet based upon petitioner's responses to his questions. (T5. 67). On redirect examination, Flood testified that he had no recollection of looking at petitioner. (T5. 68).

### 3. Jury Deliberations

Prior to court proceedings on June 5, 2006, during which closing arguments and the jury charge were given and deliberations commenced, one of the jurors ("Juror No. 7") advised the trial court that due to a prior commitment that evening, it was necessary for her to leave court no

22

later than 3:30 p.m. that day. (T6. 4-5)[8]. Although defense counsel did not initially object to adjourning the court proceedings early that day, (T6. 5), at the start of the jury's deliberations, defense counsel advised the trial court that he would consent to substituting one (1) of the alternate jurors on the basis that Juror No. 7 was unavailable for continued service in lieu of an early adjournment of proceedings that day. (T6. 136-37). The trial court ruled that if no verdict was reached by 3:35 p.m. that day, Juror No. 7 would be excused and an alternate juror inserted in her spot. (T6. 137).

During the first day of deliberations, the jury sent notes to the trial court requesting: (1) "the exact definition of the term 'in concert[;]'" (2) the list of charges; (3) read backs of (a) Dudley's testimony describing the intruder as having hazel eyes and (b) Casillas's testimony; (4) photographs of the autopsy; and (5) "Accomplice's evidence is not enough corroborating evidence from third-party?" (T6. 138). The jury was provided with the autopsy photographs; the trial court read back the portions of its charge having to do with "acting in concert" and "accomplice as a matter of law" and the four counts against petitioner; and the court reporter read back the relevant testimony of Dudley. (T6. 139-51). The judge then re-visited the issue of excusing Juror No. 7 and read a document signed by petitioner indicating his consent to replacing Juror No. 7 with the first alternate juror pursuant to Section 270.35(1) of the New York Criminal Procedure Law. (T6. 139-40). Juror No. 7 was then excused and replaced with alternate juror number one (1). (T6. 151-52). The court reporter then read back Casillas's entire testimony. (T6. 153). The jury then sent an additional note requesting an itemized listing of the evidence. (T6. 154).

---

[8] References to the transcript of the proceedings on June 5, 2006 are cited as "(T6.)"

At the start of the second day of deliberations, the jury was advised that it could not have the list of exhibits kept by the trial court, but that if they wanted a particular item, they could send a request out and, if the item had been marked as evidence, it would be sent in to the jurors. (T7. 4-5).[9] During the second day of deliberations, the jury requested Dudley's original statement to police if it was in evidence and read backs of the following testimony: (1) any testimony describing the click of the gun and the "immediate context of two or three questions;" (2) Bidot's entire testimony; (3) any portions of Glover's testimony "where he is being questioned about dates of contact/conversion [interpreted by the trial court as conversation] with [petitioner] and police;" (4) any portions of Glover's testimony concerning his initial contact with Santalis; and (5) Dudley's entire testimony. (T7. 8-10, 13, 19-20, 26-27). The court reporter read back the requested testimony. (T7. 22). At the end of the second day of deliberations, the jury requested a read back of Santalis's entire testimony. (T7. 28).

At the start of the third day of deliberations, the court reporter read back the entire testimony of Santalis. (T8. 4)[10]. During deliberations, the jury requested read backs of: (1) the portion of Bidot's testimony dealing with a "vendetta" or "setup" and "the immediate context of three or so questions," (T8. 5); (2) the entire testimony of Nolan and Ventura, (T8. 8); (3) the portions of Dudley's testimony where she is questioned about the hazel-colored eyes of the intruder with the gun, (T8. 15); (4) the portion of Santalis's cross-examination "concerning the assault charge and the remainder of the cross-examination after that point," (T8. 15); and (5) the portion of Santalis's testimony "where an assault charge (of 6/04– of June of '04) is mentioned.

[9] References to the transcript of the proceedings on June 6, 2006 are cited as "(T7.)"

[10] References to the transcript of the proceedings on June 7, 2006 are cited as "(T8.)"

24

After questions regarding the injury to her older son and up until her testimony about the statement to police in May of '05," (T8. 25). The court reporter read back the requested testimony. (T8. 7, 14, 16, 26).

There was a "slight delay" in the commencement of proceedings on the fourth day of deliberations. (T9. 3)[11]. After the jury commenced deliberations that day, defense counsel informed the trial court, outside of the jury's presence, that petitioner had told him: (1) that "he had been told that there was a conversation between potentially members of the victim's family and the jurors;" and (2) that "he overheard conversation between court officers in the lockup concerning discussions between jurors and members of the victim's family." (T9. 4-5). The trial court indicated that in light of the "tenuous atmosphere," it was "going to let [the issue] lie for now," but would raise it "[i]f there [came] a point during the afternoon before the[] [jury] reached a verdict * * *." (T9. 7).

During the fourth day of deliberations, the jury requested: (1) a read back of Bidot's entire testimony, (T9. 9)[12]; (2) the dates of (a) petitioner's arrest, (b) Santalis's first written statement to police wherein she names petitioner, Williams and Brewster and (c) "the grand jury for this case," (T9. 9); and (3) clarification regarding "whether or not [Santalis] made any statement to police in this case in August of 2004," (T9. 10-11). The jury was provided with a certain item of evidence indicating petitioner's arrest date, (T9. 12); was told by the trial court the date of Santalis's "first and only written statement" and that there is no evidence in the record

---

[11] References to the transcript of the proceedings on June 8, 2006 are cited as "(T9.)"

[12] Although the trial court advised the jury that the read back of Bidot's testimony would be given after the lunch break, (T9. 9), there is no indication in the transcript that such read back was ever given, (T9. 10-24).

indicating that Santalis ever made any statement to the police regarding this case in August 2004, (T9. 13); and the court reporter read back a portion of Glover's testimony indicating the grand jury date, (T9. 13).

At 4:45 p.m. on the fourth day of deliberations, the jury sent a note to the trial judge requesting a "private meeting" with him. (T9. 14-15). Neither petitioner, nor anyone else except court personnel and counsel for both sides, was present when that note was read because, based upon defense counsel's representations earlier that day about possible contact between the jurors and members of the victim's family, and comments from two (2) court officers regarding potential issues with the jurors parking in the public parking lots, the judge believed that the jurors may have been concerned for their safety and privacy. (T9. 14-17). Upon entering the courtroom and being asked "what the topic would be of any meeting like that," the jury foreperson indicated that they were "having trouble agreeing" and "wanted some advice on how long [they] should try to come to an agreement." (T9. 19). The judge then sent the jury back out, had the petitioner brought back into the courtroom and then had the jury brought back into the courtroom. (T9. 20-21). In petitioner's presence, the trial court declared a recess until the next day, June 9, 2006. (T9. 19-20).

### 4. The Allen Charge and Verdict

Prior to deliberations on June 9, 2006, the defense moved for a mistrial pursuant to Section 310.60(1)(a) of the New York Criminal Procedure Law "based on the jury being unable to reach a verdict." (T10. 3)[13]. Defense counsel argued: (1) that the presentation of evidence

---

[13] References to the transcript of the proceedings on June 9, 2006 are cited as "(T10.)"

lasted "a little bit over four days" and the jury had been deliberating from Monday around 12:30 or 1:00 p.m. to Thursday around 4:45 p.m. without reaching an agreement, so if they continued their deliberations on Friday morning, "they would have been deliberating just about for as long as it took for the evidence to be presented," (T10. 4); (2) that the jury had sent approximately thirteen (13) notes to the court during their deliberations, the majority of which requested a read back of testimony, (T10. 4-5), thus suggesting that the jury was trying to "resolve an issue of credibility," (T10. 5); and (3) that he was, therefore, concerned about "the potential for a coerced verdict," (T10. 6-7).

The trial court denied the application for a mistrial on the grounds, *inter alia*: (1) that the jury had not been deliberating for as long as defense counsel suggested in light of (a) the number of read backs requested and given, including the entire testimony of two (2) witnesses, (b) lunch breaks and (c) the insertion of an alternate juror, which required the jury "to almost go back to square one and start over," (T10. 8-9); and (2) that the jury never indicated that they were deadlocked, (T10. 10). The trial court then gave the jury the following "short <u>Allen</u> charge [it] used in the past":

> Members of the jury, you've indicated you're having difficulty in reaching a unanimous decision. You've been at this for several days now. But you must realize that the only method we have to resolve a criminal case is the verdict of a jury. Absolute certainty cannot be expected in every case. Though the verdict to which you agree must be your own individual verdict, the truth is that in order to bring twelve minds to a [sic] unanimous agreement, you must also examine the questions submitted to you with candor and with the proper regard with the opinions of others.
>
> You should, of course, know that this case must be decided sooner or later, that any future jury will be selected from the same group of citizens here in Suffolk County and in the same manner as you were. And there's no reason to believe that this case will ever be submitted – and I say that sincerely – to twelve more

intelligent, impartial, competent people. No more or clearer evidence will be produced at some subsequent trial.

Accordingly, it is your duty to decide this case now if you can conscientiously do so. Otherwise, we have to try this case again and the witnesses will have to come back to be questioned again.

Now, in conferring together, you should, obviously, respect each other's opinion and listen to each other's point of view. But if the majority of you are for acquittal, the others should ask themselves whether their judgment should be reconsidered since it is not shared by most of their colleagues.

If the majority of you are for conviction, the consenting [sic] jury should consider whether the doubt in their mind is a reasonable one since it has not made a sufficient impression on the minds of others hearing the same evidence with the same intention and same desire to arrive at the truth.

The point is: Don't be afraid to change your position if based on the evidence and reasons offered by your colleagues you are convinced it's the right thing to do.

Remember, you are not advocates for one side or the other. You are not partisans. You're the judges of the facts. Your sole interest is to ascertain the truth from the evidence.

With that said, I am going to ask you to return to the jury room. I want to remind you that nothing I have said should be construed as an indication you should vote one way or the other, that you should relinquish your honest convictions. However, these instructions are guidelines in helping you to reach a verdict.

I ask you to resume your deliberations and, of course, we'll be here to assist you in any way we can. That's it. I direct the jury to resume deliberations. Please discuss the case.

(T10. 12-15).

After the <u>Allen</u> charge was read, the jurors sent one (1) more note reading: "Your Honor, does the assault charge also contain the, quote, in concert, unquote, clause as the murder charge does? Thank you." (T10. 16). In the presence of petitioner, counsel and the jury, the trial court stated: "The acting in concert theory applies to all four counts. All four counts of the

indictment." (T10. 17). Shortly thereafter, the jurors reached a verdict finding petitioner guilty of one (1) count of murder in the second degree (N.Y. Penal Law § 125.25(3) (felony murder)), one (1) count of assault in the first degree (N.Y. Penal Law § 120.10(4)) and two (2) counts of burglary in the first degree (N.Y. Penal Law §§ 140.30(2) and (3)). (T10. 19-21).

B.     Procedural History

On June 23, 2006, a judgment of conviction was entered against petitioner in the trial court upon the jury verdict and imposition of sentence, as a prior felony offender, to a term of imprisonment of twenty-five (25) years to life for the conviction of murder in the second degree, to run consecutive to concurrent determinate terms of imprisonment of fifteen (15) years for each of the convictions of assault in the first degree and burglary in the first degree.[14] (S. 27-28).

Petitioner appealed his judgment of conviction to the Supreme Court of the State of New York, Appellate Division, Second Judicial Department ("Appellate Division") on the grounds, *inter alia*: (1) that the trial court, in response to a jury note indicating that the jurors were deadlocked on a verdict, deprived him (a) of his right to be present at all phases of his trial when it reconvened, heard argument and gave supplemental instructions to the jury in his absence, and (b) of his right to due process when it refused to grant a mistrial and instead gave the jury a "coercive and unbalanced" Allen charge; (2) that he was denied the effective assistance of counsel when his trial counsel failed to object to the trial court reconvening and giving supplemental instructions to the jury in his absence; (3) that he was denied his rights to due process and to confront the witnesses against him by the admission into evidence of "bolstering"

---

[14]  The trial court also imposed a period of post-release supervision for five (5) years for the conviction of assault in the first degree. (S. 27).

29

hearsay evidence and prior consistent statements of two (2) witnesses, i.e., Santalis and Glover; (4) that the evidence was legally insufficient to prove his guilt beyond a reasonable doubt since the accomplice testimony against him was insufficiently corroborated; and (5) that the sentence imposed was harsh and excessive.

By order dated October 20, 2009, the Appellate Division affirmed the judgment of conviction finding, *inter alia*: (1) that petitioner's contentions that he was denied his rights to be present at all stages of the trial, to the effective assistance of counsel and to due process of law based upon the trial court's refusal to grant a mistrial were without merit; (2) that the trial court properly admitted the prior consistent statements of Santalis after defense counsel effectively challenged her testimony as a recent fabrication; (3) that the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt and independent evidence sufficiently corroborated the testimony of petitioner's accomplice, Santalis; (4) that the sentence imposed was not excessive; and (5) that "notwithstanding [petitioner's] failure to preserve his objection to the court's [Allen] instruction to the jury for appellate review (see [N.Y.] C.P.L. 470.05(2)), the contention that the [Allen] instruction was coercive also is without merit." People v. Bryson, 66 A.D.3d 916, 917-18, 887 N.Y.S.2d 263 (2d Dept. 2009). On December 28, 2009, the Court of Appeals of the State of New York denied petitioner's application for leave to appeal to that court from the October 20, 2009 order of the Appellate Division. People v. Bryson, 13 N.Y.3d 905, 895 N.Y.S.2d 320, 922 N.E.2d 909 (App. Div. 2009). Thus, petitioner's judgment of conviction became final on March 28, 2010, when his time expired to seek direct review by writ of certiorari to the United States Supreme Court. See Rule 13(1) of the Rules of the Supreme Court of the United States; 28 U.S.C. §2101(d); Gonzalez v. Thaler, 132 S. Ct 641, 653-54, 181 L. Ed. 2d 619

(2012).

On February 8, 2011, petitioner filed a petition in this Court seeking a writ of habeas corpus pursuant to 28 U.S.C. § 2254 on the grounds: (1) that he was denied his right to be present at all material stages of his trial when, in his absence, the trial court reconvened, heard argument and gave supplemental instructions to the jury in response to the juror's note that they were deadlocked on a verdict (Ground One); (2) that he was denied his right to due process when the trial court refused to grant a mistrial and gave a "coercive and unbalanced" Allen charge to the jury (Ground Two); (3) that he was denied his right to confrontation by the admission into evidence of "bolstering" hearsay statements and prior inconsistent statements of Santalis and Glover (Ground Three); and (4) that the evidence was legally insufficient to find him guilty beyond a reasonable doubt because Santalis's testimony was insufficiently corroborated (Ground Four). Respondent filed his return on April 19, 2011.

In September 2011, almost five (5) months after respondent filed his return to the petition, petitioner sought leave to amend his petition to assert two (2) claims based upon the alleged ineffective assistance of trial counsel for: (1) failing to object to the trial court reconvening, hearing argument and giving the jury supplemental instructions in his absence, and waiving his right to be present at a material stage of the trial; and (2) failing to move to suppress his confession pursuant to Section 60.45(2) of the New York Criminal Procedure Law. In his "traverse" in reply to respondent's return, received by the Court on March 7, 2012, petitioner also improperly raised for the first time an additional claim that the sentence imposed was harsh and excessive.

On July 18, 2012, this Court received a motion by petitioner seeking, *inter alia*, to hold

31

his petition in abeyance to allow him to file a motion in the trial court pursuant to Section 440.10 of the New York Criminal Procedure law ("440.10 motion"). By order dated August 10, 2012, petitioner's application to hold his petition in abeyance was denied on the basis that petitioner failed to establish any cause for his failure to exhaust any previously unexhausted claims in the trial court or that there is potential merit to any of the claims he intended to assert in a 440.10 motion in the trial court.

By order dated August 10, 2012, this Court denied petitioner's motions to amend in their entirety, finding, *inter alia*: (1) that since the proposed claims are time-barred, any amendment to the original pleading would be futile; and (2) that inadequate access to the law library did not cause petitioner to miss the original filing deadline so the doctrine of equitable tolling is unavailable to petitioner.

III.    Discussion

A.    Standard of Review

Pursuant to 28 U.S.C. § 2254(d), an application for a writ of habeas corpus that has met the procedural prerequisites of the AEDPA:

> "Shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim—(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."

"An 'adjudication on the merits' is one that '(1) disposes of the claim on the merits, and (2) reduces its disposition to judgment.'" Bell v. Miller, 500 F.3d 149, 155 (2d Cir. 2007) (citing

Sellan v. Kuhlman, 261 F.3d 303, 312 (2d Cir. 2001)).

A state court determination is "contrary to * * * clearly established Federal law," 28 U.S.C. §2254(d), "if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." Williams v. Taylor, 529 U.S. 362, 412-13, 120 S. Ct. 1495, 146 L. Ed. 2d 389 (2000); see also Lafler v. Cooper, — U.S. —, 132 S. Ct. 1376, 1390, 182 L. Ed. 2d 398 (2012) ("A decision is contrary to clearly established law if the state court applies a rule that contradicts the governing law set forth in Supreme Court cases." (alterations, quotations and citation omitted)).

Alternatively, under the "unreasonable application" clause of Section 2254(d), "a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of [a] prisoner's case." Williams, 529 U.S. at 413, 12 S. Ct. 1495; see also Thaler v. Haynes, 559 U.S. 43, 130 S. Ct. 1171, 1174, 175 L. Ed. 2d 1003 (2010) (accord). "[T]he state court's decision must have been not only incorrect or erroneous but objectively unreasonable." Rompilla v. Beard, 545 U.S. 374, 380, 125 S. Ct. 2456, 162 L. Ed. 2d 360 (2005) (alterations, quotations and citation omitted); see also Ortiz v. N.Y.S. Parole in Bronx, N.Y., 586 F.3d 149, 156 (2d Cir. 2009). Thus, to obtain habeas relief from a federal court under the "demanding" "unreasonable application" standard, "a state prisoner must show that the challenged state-court ruling rested on an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Metrish v. Lancaster, — U.S. —, 133 S. Ct. 1781, 1786-87, 185 L. Ed. 2d 988 (2013) (quotations and citation omitted). The "unreasonable application" standard is met if

33

fairminded jurists can conclude only that a state court decision is "unexpected and indefensible by reference to existing [Supreme Court] law." Id. at 1792 (quotations and citation omitted).

Although claims that were not adjudicated on the merits in state court are not subject to the deferential standard that applies under AEDPA, see Dolphy v. Mantello, 552 F.3d 236, 238 (2d Cir. 2009), where AEDPA's deferential standard of review does apply, federal courts are required "to presume the correctness of [the] state court['s] factual findings unless [the] applicant[] rebut[s] this presumption with 'clear and convincing evidence.'" Schriro v. Landrigan, 550 U.S. 465, 473-74, 127 S. Ct 1933, 167 L. Ed. 2d 836 (2007) (quoting Section 2254(e)(1)); see also Epps v. Poole, 687 F.3d 46, 50 (2d Cir. 2012), cert. denied, 133 S. Ct. 1499, 185 L. Ed. 2d 555 (2013) ("The state court's findings of fact are presumed to be correct unless the petitioner can rebut this presumption by clear and convincing evidence"). Under AEDPA's deferential standard of review, "[f]ederal courts sitting in habeas are not an alternative forum for trying facts and issues which a petitioner made insufficient effort to pursue in state proceedings.'" Cullen v. Pinholster, — U.S. —, 131 S. Ct 1388, 1401, 179 L. Ed. 2d 557 (2011) (quoting Williams, 529 U.S. at 437, 120 S. Ct 1479).


B.      Right to be Present Claim

Petitioner contends that he was denied his right to be present at a material stage of trial when, in his absence, the trial court reconvened, heard argument and gave supplemental instructions to the jury in response to the jurors' note that they were deadlocked on a verdict.

The Appellate Division found that "[petitioner's] contention that he was denied his right

to be present at all stages of trial * * * in connection with the jury's request for a conference with the court is without merit." People v. Bryson, 66 A.D.3d at 917, 887 N.Y.S.2d 263.

"Under the Sixth Amendment's Confrontation Clause, a defendant has the right to be present at trial to confront the witnesses against him." Jones v. Murphy, 694 F.3d 225, 239 (2d Cir. 2012), cert. denied, 133 S. Ct. 1247, 185 L. Ed. 2d 192 (2013); see also U.S. v. Tureseo, 566 F.3d 77, 83 (2d. Cir. 2009). However, where, as here, the claimed error does not relate to the defendant's opportunity to confront the witnesses and evidence against him, the right to be present is protected by the Due Process Clause. See United States v. Gagnon, 470 U.S. 522, 527, 105 S. Ct. 1482, 84 L. Ed. 2d 486 (1985) (alterations, quotations and citation omitted); Monroe v. Kuhlman, 433 F.3d 236, 246 (2d Cir. 2006). The Due Process Clause extends the right to be present "to 'critical stages' of the trial beyond the presentation of evidence when the defendant's 'presence has a relation, reasonably substantial, to the fulness of his opportunity to defend against the charge.'" Jones, 694 F.3d at 239 (quoting Kentucky v. Stincer, 482 U.S. 730, 745, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987)). "[T]he constitutional right to be present at one's own trial exists 'at any stage of the criminal proceeding that is critical to its outcome if [the defendant's] presence would contribute to the fairness of the procedure.'" Tureseo, 566 F.3d at 83 (quoting Stincer, 482 U.S. at 745, 107 S. Ct 2658); see also Gagnon, 470 U.S. at 526, 105 S. Ct. 1482 ("The presence of a defendant is a condition of due process to the extent that a fair and just hearing would be thwarted by his absence, and to that extent only." (quotations and citation omitted)). "The right [to be present] is not unqualified, and it does not exist where the defendant's presence would be useless, or the benefit but a shadow." Grayton v. Ercole, 691 F.3d 165, 170 (2d Cir. 2012) (quotations and citation omitted); see also Gagnon, 470 U.S. at 526-

27 ( holding that a defendant's right to be present does not extend to instances in which the defendant "could have done nothing had he been [present], nor would he have gained anything by attending.")

Moreover, any error in conducting proceedings in the defendant's absence "is reviewed for harmlessness, i.e., whether the error created any reasonable probability of prejudice." Tureseo, 566 F.3d at 84 (quotations and citation omitted); see also United States v. Collins, 665 F.3d 454, 460 (2d Cir. 2012) (holding that a violation of a defendant's due process right to be present "only requires reversal if it is not harmless.")

Initially, contrary to petitioner's contention, the trial court did not receive a note from the jurors indicating that they were deadlocked on a verdict, nor did it give the jury any supplemental instructions at that time. Rather, the note received by the trial court requested a private meeting with the trial judge and, under the circumstances of this case, the trial court's conduct in the face of that ambiguous note was not unreasonable. In any event, petitioner's presence was not required while the trial court heard argument from counsel about how to proceed in the face of such an ambiguous note and inquired of the jury about the reason for their request for a "private meeting" in order "to ensure fundamental fairness or a reasonably substantial opportunity to defend against the charge[s]" against him. Gagnon, 470 U.S. at 527, 105 S. Ct. 1482. Petitioner has not demonstrated how his presence in the courtroom during that argument and limited inquiry of the jurors would have benefitted his defense, nor how his absence therefrom compromised the fairness of the trial. See, e.g. Stincer, 482 U.S. at 747, 107 S. Ct. 2658; Gagnon, 470 U.S. at 527, 105 S. Ct. 1482. Accordingly, the Appellate Division's rejection of petitioner's right to be present claim as "without merit" was not contrary to, or an unreasonable

application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's right to be present claim (Ground One) is denied.

### C.    Allen Charge Claim

Petitioner contends that he was denied due process when the court denied defense counsel's request for a mistrial pursuant to Section 310.60(1)(a) of the New York Criminal Procedure Law and instead delivered a "coercive and unbalanced" Allen charge to the jury.

The Appellate Division found that "[t]he defendant's contention that he was denied due process of law based on the court's refusal to declare a mistrial is without merit * * * the contention that the instruction was coercive also is without merit." People v. Bryson, 66 A.D.3d at 917-18, 887 N.Y.S.2d 263.

A court can discontinue a trial without double jeopardy "barring a subsequent one for the same offense when 'particular circumstances manifest a necessity' to declare a mistrial." Blueford v. Arkansas, — U.S. —, 132 S. Ct. 2044, 2052, 182 L. Ed. 2d 937 (2012) (quoting United States v. Perez, 22 U.S. 579, 580, 9 Wheat. 579, 6 L.Ed. 165 (1824)); see also Renico v. Lett, 559 U.S. 766, 773-74, 130 S. Ct. 1855, 176 L. Ed. 2d 678 (2010) (holding that courts may declare a mistrial "whenever, in their opinion, taking all the circumstances into consideration, there is a manifest necessity for doing so." (quotations and citation omitted)). A jury's inability to reach a verdict "has long been considered the classic basis establishing such a necessity." Blueford, 132 S. Ct. at 2052 (quotations and citation omitted); see also Renico, 559 U.S. at 774, 130 S. Ct. 1855 ("[W]hen a judge discharges a jury on the grounds that the jury cannot reach a

37

verdict, the Double Jeopardy Clause does not bar a new trial for the defendant before a new jury.") "The decision to declare a mistrial is left to the sound discretion of the judge, but the power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." Renico, 559 U.S. at 774, 130 S. Ct. 1855 (quotations and citation omitted).

On the other hand, "[i]t has long been established that when a trial court receives notice that the jury is deadlocked it may give a charge, commonly referred to as a [sic] 'Allen' charge, that urges the jurors to continue deliberations in order to reach a verdict." United States v. Vargas-Cordon, — F.3d —, 2013 WL 4046274, at * 7 (2d Cir. Aug. 12, 2013) (quotations and citation omitted); see also Lowenfield v. Phelps, 484 U.S. 231, 237, 108 S. Ct. 546, 98 L. Ed. 2d 568 (1988) (holding that a court's use of an Allen charge "has long been sanctioned." (citing Allen v. United States, 164 U.S. 492, 501-02, 17 S.Ct. 154, 41 L.Ed. 528 (1896)). When analyzing an Allen charge, it is important to determine "[w]hether in its context and under all the circumstances of [the] case the [charge] was coercive." Jenkins v. United States, 380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957 (1965); see also Lowenfield, 484 U.S. at 237, 108 S. Ct. 546 (holding that an Allen charge must be considered "in its context and under all the circumstances."); Vargas-Cordon, — F.3d —, 2013 4046274, at * 7 ("Whether an Allen charge is appropriate given the circumstances of a particular case hinges on whether it tends to coerce undecided jurors into reaching a verdict– that is, whether the charge encourages jurors to abandon, without any principled reason, doubts that any juror conscientiously holds as to a defendant's guilt." (quotations and citation omitted)). Allen charges containing language reminding jurors not to surrender their honest convictions or to abandon their conscientious opinions have generally been found not to be coercive. See, e.g. Vargas-Cordon, — F.3d —,

38

2013 WL 4046274, at * 8 (holding that language warning jurors not to surrender their conscientiously held beliefs has ben "held to mitigate greatly a charge's potential coercive effect."); United States v. Henry, 325 F.3d 93, 107 (2d Cir. 2003) (holding that language reminding the jurors not to surrender their honest convictions "is a necessary part of an Allen charge and negates coercion.")

Initially, the jury in this case never indicated that it was deadlocked or that there was no chance that they could arrive at an unanimous verdict. Rather, the jury foreperson indicated that the jurors were "having trouble agreeing" and "wanted some advice on how long [they] should try to come to an agreement." (T9. 19). By giving the jury an Allen charge, the trial court gave the jurors exactly what they requested, i.e., guidance. Thus, the Appellate Division's rejection of petitioner's claim that the trial court erred in denying defense counsel's application for a mistrial and giving an Allen charge instead was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

Moreover, the trial court's Allen charge was not coercive because, *inter alia,* it instructed the jurors to respect each other's opinions and listen to each other's point of view; it reminded the jurors of their duty to decide the case if they could conscientiously do so, but did not suggest to them that they were failing in their duties; and it did not present the prospect of prolonged deliberations or overemphasize the need to get a result. In addition, the jurors were properly advised not to abandon their conscientiously held beliefs by the following instruction: "I want to remind you that nothing I have said should be construed as an indication you should vote one way or the other, that you should relinquish your honest convictions." (T10. 14). Moreover, the

trial court appropriately instructed the jury that its "instructions are guidelines in helping [them] to reach a verdict," (T10. 13-14); see, e.g. Henry, 325 F.3d at 107, and that their "sole interest is to ascertain the truth from the evidence." (T10. 13-14). Accordingly, the Appellate Division's rejection of petitioner's claim that the Allen charge was coercive as being "without merit" was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. Therefore, petitioner's Allen charge claim (Ground Two) is denied.

### D.    Evidentiary Claims

Federal habeas review is limited to determining whether a petitioner's custody violates federal law, see 28 U.S.C. § 2254(a), and "does not lie for errors of state law," Swarthout v. Cooke, —U.S. —, 131 S. Ct. 859, 861, 178 L. Ed. 2d 732 (2011); Wilson v. Corcoran, —U.S.—, 131 S. Ct. 13, 16, 178 L. Ed. 2d 276 (2010), "includ[ing] erroneous evidentiary rulings." Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006); see also Vega v. Walsh, 669 F.3d 123, 126 (2d Cir. 2012) ("[S]tate trial court evidentiary rulings generally are not a basis for habeas relief.")  Challenges to the admissibility of evidence are cognizable on habeas review only "to assess whether the error deprived the petitioner of his due process right to a 'fundamentally fair trial.'" Freeman v. Kadien, 684 F.3d 30, 35 (2d Cir. 2012), cert. denied, 133 S. Ct. 765, 184 L. Ed. 2d 506 (2012) (quoting Zarvela v. Artuz, 364 F.3d 415, 418 (2d Cir. 2004)); see also McKinnon v. Superintendent, Great Meadow Correctional Facility, 422 Fed. Appx. 69, 72-73 (2d Cir. May 24, 2011), cert. denied, 132 S. Ct. 1151, 181 L. Ed. 2d 1024 (2012) (summary order) ("[A] state court's evidentiary rulings, even if erroneous under state law, do not present

40

constitutional issues cognizable under federal habeas review * * * unless the challenged evidentiary rulings in the state proceedings affect the fundamental fairness of those proceedings[.]") An erroneous evidentiary ruling does not amount to a constitutional violation unless the evidence in question was "so extremely unfair that its admission violates 'fundamental conceptions of justice.'" Dowling v. United States, 493 U.S. 342, 352, 110 S. Ct. 668, 107 L. Ed. 2d 708 (1990) (quoting United States v. Lovasco, 431 U.S. 783, 790, 97 S. Ct 2044, 2048, 52 L. Ed. 2d 752 (1977)); see also Evans v. Fischer, 712 F.3d 125, 133 (2d Cir. 2013) ("[T]o establish that an erroneous application of state rules of evidence violates the federal guarantee of due process, [the petitioner] must * * * demonstrate that the state court's erroneous conclusions about New York evidence law were so egregious as to implicate the Fourteenth Amendment's guarantee of due process. That guarantee * * * is one of 'fundamental fairness,' a principle that the Supreme Court has 'defined . . . very narrowly.'" (quoting Dowling, 493 U.S. at 352, 110 S. Ct. 668)). "The erroneous admission of evidence rises to a deprivation of due process under the Fourteenth Amendment only if the evidence in question was sufficiently material to provide the basis for conviction or to remove a reasonable doubt that would have existed on the record without it." Johnson v. Ross, 955 F.2d 178, 181 (2d Cir. 1992) (internal quotations and citations omitted); see also McKinnon, 422 Fed. Appx. at 73. In short, the erroneously admitted evidence, must have been "crucial, critical, highly significant." Collins v. Scully, 755 F.2d 16, 19 (2d Cir. 1985).


1.     The Bolstering Claim (Ground Three)

Petitioner claims that he was denied his right to confrontation by the admission into

41

evidence of "bolstering" hearsay statements, i.e., the prior consistent statements of Santalis and Glover on redirect examination, and by the prosecutor's references to Mercer's testimony during summation, which petitioner claims bolstered Bidot's testimony.

Initially, although petitioner presents this claim as one for a violation of the Confrontation Clause, he cannot establish that he was denied his right to confront the witnesses against him since all three (3) witnesses whose testimony he claims was bolstered in some way actually testified at trial and were subjected to vigorous cross-examination. "[T]he Confrontation Clause is not violated by admitting a declarant's out-of-court statements, as long as the declarant is testifying as a witness and subject to full and effective cross-examination." California v. Green, 399 U.S. 149, 156, 90 S. Ct. 1930, 26 L. Ed. 2d 489 (1970); see also Crawford v. Washington, 541 U.S. 36, 59 n. 9, 124 S. Ct. 1354, 158 L. Ed. 2d 177 (2004) ("[W]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. * * * The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it."); Stincer, 482 U.S. at 737, 107 S. Ct. 2658 (holding that in cases involving the admission of out-of-court statements, "the Confrontation Clause is violated when hearsay evidence is admitted as substantive evidence against the defendant * * * with no opportunity to cross-examine the hearsay declarant at trial, or when an out-of-court statement of an unavailable witness does not bear adequate indications of trustworthiness." (alterations, quotations and citations omitted)). Accordingly, so much of petitioner's "bolstering" claim as alleges a violation of the Confrontation Clause is denied.

On cross-examination, Santalis was questioned about a written statement she had given to the police on May 5, 2005, in which she did not indicate that petitioner was living at her grandmother's house on April 26, 2004. (T3. 157-58, 178). Rather, her written statement indicates that petitioner "came over" to her grandmother's house on April 26, 2004 and walked to her grandmother's house. (T3. 158, 178). Santalis testified on cross-examination that although her written statement indicates otherwise, petitioner was living at her grandmother's house and "[t]he only one who walked to [her] grandmother's house was William Brewster." (T3. 158-59). According to Santalis, she "was very nervous and [she] didn't tell the truth when [she] gave that [written] statement." (T3. 158-59).

On redirect examination, Santalis was asked if she "remember[ed] telling the police in [the May 5, 2005] written statement: I drove [Williams] and [petitioner] back to my grandmother's house?" (T3. 186). Defense counsel objected to that question on the grounds that "it has nothing to do with what [defense counsel] crossed on" and that it was a prior consistent statement intended to bolster Santalis's testimony on direct examination. (T3. 187). The trial court indicated that the district attorney was "trying to point out consistencies in the statement as well" under the recent fabrication exception to the evidentiary rule precluding the admission at trial of a witness's prior consistent statements. (T3. 187). Defense counsel argued that "[t]he only way to bring up a prior consistent statement is to show it predated the motive to fabricate. And [his] position is the motive to fabricate was made at the time this question was made." (T3. 188). The following colloquy then ensued:

> Q. Miss Santalis, did you not say: I drove [Williams and petitioner] back to my grandmother's house. The three of us spent the night – rest of the night. [Petitioner] was there with my cousin Michelle Casillas?
>
> A. Yes.
>
> Q. And you said that in your written statement; is that correct?
>
> A. Yes.
>
> Q. And that was back on May 5th of 2005?
>
> A. Yes.

(T3. 188). The trial court denied defense counsel's subsequent motion for a mistrial based upon the admission into evidence of Santalis's prior consistent statements "that did not predate the motive to fabricate." (T3. 192).


ii.    Glover's Testimony

On cross-examination, Glover was questioned about his testimony on direct about a conversation he had with petitioner on Brook Avenue in Bay Shore. (T4. 73). The following colloquy ensued regarding Glover's grand jury testimony:

> Q. And [the prosecutor] is the one who asked you questions about this conversation you say you had with [petitioner] in Bay Shore, right?"
>
> A. Yes.
>
> Q. Do you remember * * * hearing the following questions and giving the following answers?
>
> * * *
>
> Q. Question: Do you know how long after the murder it was that you had that conversation?

44

ANSWER: Like, a day later.

QUESTION: Do you remember where you were when you had that conversation?

ANSWER: CI.

And I should back up. Let me ask you one other question and answer. This precedes that.

Did there come a time when you had a conversation with [petitioner] * * * regarding that murder?

ANSWER: Yes.

* * *

QUESTION: Do you know any particular location in Central Islip that you were at at that time?

ANSWER: On Hickory Street.

QUESTION: Were you at any particular individual's home?

ANSWER: [Santalis's] house.

Do you remember those questions and those answers to the grand jury?

A. It was quite a while ago, yes.

Q. You gave those answers to those questions under oath, right?

* * *

A. Yes, I did.

* * *

Q. But today you're saying the conversation occurred on Brook Street in Bay Shore, correct?

A. Yeah, because it happened over a year ago.

Q. When did you testify to the grand jury?

45

A. Last year.

Q. So isn't it true that that was closer in time to the incident than today?

A. Yeah, but I'm saying my life went on. You know, what I mean? I wasn't thinking about it. I was home.

* * *

Q. When you were under oath, why did you say Central Islip?

[Assistant District Attorney]: At what time, your Honor?

Q. To the grand jury when you testified.

A. Why'd I say Central Islip?

Q. Yeah.

A. I got it mixed up. You know.

(T4. 74-77).

On redirect examination, Glover testified that an incident during which Santalis stopped to talk to Carter, at which Williams was also present, had occurred at Santalis's house on Hickory Street in Central Islip. (T4. 99-100). Glover was then questioned about his written statement to police on December 28, 2004, prior to his grand jury testimony in May 2005, indicating that he had told the police that he spoke with petitioner on Brook Avenue in Bay Shore. (T4. 101-03). Defense counsel again moved for a mistrial on the basis that Glover's prior consistent statement did not predate the motive to fabricate, i.e., the statement was "purportedly made at the same time was [sic] when the motive to fabricate clearly existed, namely, when [Glover] was under arrest and looking for help and satisfied he was going to speak about these

charges," (T4. 106-07), and bolstered Glover's testimony on direct examination. (T4. 106-07). The trial court denied the application for a mistrial. (T4. 107-08).

### iii.    Analysis

To the extent petitioner's claim merely challenges the admission into evidence of the prior consistent statements of Santalis and Glover, that claim is not cognizable on federal habeas review. While New York prohibits "bolstering," which, in the context of this case, involves "the fortification of a witness's testimony and credibility through the use of a prior consistent statement," People v. Buie, 86 N.Y.2d 501, 510, 634 N.Y.S.2d 415, 658 N.E.2d 192 (1995), unless such evidence is being used "to rebut a claim of recent fabrication," id., "it is not forbidden by the Federal Rules of Evidence and is not sufficiently prejudicial to deprive a defendant of his due process rights to a fair trial." Nieves v. Fischer, No. 03 Civ. 9803, 2004 WL 2997860, at *7 (S.D.N.Y. Dec. 28, 2004)(quotations and citations omitted); see also Ochoa v. Breslin, 798 F.Supp.2d 495, 505-06 (S.D.N.Y. 2011). Courts in this circuit have repeatedly held that "the concept of 'bolstering' really had no place as an issue in criminal jurisprudence based on the United States Constitution," Castaldi v. Poole, No. 07-cv-1420, 2013 WL 789986, at * 7 (E.D.N.Y. Mar. 1, 2013) (quotations and citations omitted); Nieves, 2004 WL 2997860, at *7, and is a state law evidentiary issue. See, e.g. Moore v. Ercole, No. 09-cv-1003, 2012 WL 407084, at * 9 (E.D.N.Y. Feb. 8, 2012) ("[A] claim of impermissible bolstering, although recognized under New York law, is not a cognizable basis for habeas relief."); Glover v. Burge, 652 F.Supp.2d 373, 377 (W.D.N.Y. 2009) ("'[B]olstering' of a prosecution witness's testimony does not state a constitutional claim redressable on federal habeas review."); Lebron v. Sanders,

02 Civ. 6327, 2008 WL 793590, at *20 (S.D.N.Y. Mar. 25, 2008) (holding that a violation of

New York's "bolstering" rule does not rise to a constitutional level); Diaz v. Greiner, 110

F.Supp.2d 225,234 (S.D.N.Y. 2000) (holding that bolstering claims are not cognizable on federal

habeas review).

Moreover, the Second Circuit recently held that:

> "[t]he combination of the Supreme Court's 'fundamental fairness' cases and the
> limited habeas jurisdiction granted by AEDPA means that [state court prisoners
> seeking habeas relief] must demonstrate that the effect of the admission of
> ["bolstering" evidence] was so prejudicial to his defense that he was deprived of
> due process *and* he must identify a Supreme Court case that clearly establishes
> that the admission of evidence that improperly bolsters a prosecution witness's
> testimony constitutes a violation of the Fourteenth Amendment. * * * [N]o
> Supreme Court case requires such a conclusion * * *."

Evans, 712 F.3d at 133 (emphasis in original). Since any error in the admission of the challenged

testimony of Santalis and Glover as "bolstering" under state law "does not rise to constitutional

dimensions," McKinnon, 422 Fed. Appx. at 74, so much of petitioner's "bolstering" claim as

challenges the admission of Santalis's and Glover's prior consistent statements into evidence at

trial "is not cognizable under federal habeas review," id., and is, therefore, dismissed.


b.    Prosecutorial Misconduct Claim

To the extent petitioner's remaining "bolstering" claim challenges comments made by the

prosecutor during her summation, i.e., that the prosecutor's references to Mercer's testimony

during her comments about Bidot's testimony improperly bolstered Bidot's credibility, such

claim is construed as a prosecutorial misconduct claim.

During summations, defense counsel, *inter alia*, made the following comments about

Bidot's testimony:

"I want to talk a little bit now about Maurice Bidot. Maurice Bidot testified he's cousins with [petitioner]. He testified that [petitioner] on a number of occasions freely admitted his role and the fact that he was involved in this crime. He also indicated that he's not – doesn't expect to get any benefit for his testimony. Mr. Bidot, as we know, only talked to the police when he was arrested for his second felony. That's when he speaks to the police.

We also know as he told [the prosecutor] and all of us when [the prosecutor] got up and asked him, When did you first hear about this case? he told us in jail. Obviously, ladies and gentlemen, that's where he hears [petitioner's] name.

Again, why is [petitioner's] name there? I go back to [Santalis], what [Santalis] said right after the crime and what [Santalis] ultimately said to the police about [petitioner] being the one who did it.

So Bidot hears that and Bidot, also being a drug dealer, knows that this is information that could be useful. But he also knows, ladies and gentlemen, that someone being involved in the system having been in jail being a drug dealing criminal that, obviously, you can't go to the police saying you heard jailhouse rumors. He knows that's not going to fly. So what does he say when he gets arrested? He says [petitioner] admitted it to me. You know what, ladies and gentlemen? That made him potentially a very good witness because he's his cousin and he's saying [petitioner] was admitting it to him freely on numerous occasions. That's what he testified to.

The Suffolk County Police do only what's logical knowing he's a drug dealer, knowing he's only coming to them hoping to get a benefit, knowing there's that built-in problem with his credibility also saying to themselves, Hey this is his cousin. This could be true. Let's wire him for sound. Let's send him back out. If this is true, he'll get it again. He's talking freely about it. It's his cousin. He confides in him. He could trust him.

Ladies and gentlemen, you heard from one witness with respect to those tapes from the prosecution. Now, that one witness basically came in here, he was the lead detective in the case, the lead investigator in a case that it was a year before there was any arrest. The only thing he testified about was the fact he couldn't get this on tape. He basically came and gave an excuse for why you don't hear something on the tape. An excuse for his police department, an excuse for Mr. Bidot.

But, you know, you gotta ask yourselves something, ladies and gentlemen. In what time do we live in? Is this not the twenty first century? Do we not have tape recording devices that can be used in an investigation like this? Use your experience. And your knowledge. He told you, of course, they've used it before and, of course, they're going to use it again. They have the technology to make these tapes. They could have sent him out again. If this is true, if he's a true witness, if he did hear this from his cousin and since he's a drug-dealing lowlife, you want to get it on tape. Of course, you do. So you could come in with hard, real evidence. But what happens? What happens? Nothing. Nothing except an excuse.

Maurice Bidot had one felony when he got arrested after he got out of jail. He already had one felony on his record. He gets arrested against for another felony. That's when he starts mentioning [petitioner]. Again, currency of criminals. Currency of criminals. He knows as a drug-dealing lowlife, helping them crack a case like this that's been under investigation for many months without any arrests brings him right up to the top. Right up to the top.

And what happened? After this, after he goes to the police, what does he do? Does he reform his ways? Become a law-abiding citizen? Start living within the laws of the state? No, he picks up another felony. And at that point is he finished being a criminal? You know, now he's working with the police. You know, he wants to do justice. He wants to help rather than hurt. Does he stop then? No, he picks up his fourth felony. You know what's interesting about that, ladies and gentlemen, the sum total jail time for those three felonies, the one he committed just before speaking to the police while he was in custody and the two he commits after that, he gets one year in jail. So I guess in Suffolk County it's not one strike you're out, it's not two strikes you're out and it's not three strikes you're out. Hell, it's not even four strikes you're out. As long as you're working with the police –

[The prosecutor]: Objection, your Honor. The testimony was that at that point that had ended.

* * * [Objection overruled]

Oh, he absolutely said that. I don't disagree with [the prosecutor]. But, again, evidence doesn't mean it's true. Testimony you hear as evidence, that doesn't mean it's true as we talked about during my opening. You decide what the truth is.

What I'm doing now, I'm not saying he's saying anything different. Of course, not. He's saying no, as he kept his head down the whole time. You can judge

50

someone's demeanor by the way they look on the stand, ladies and gentlemen. And if you recollect, he didn't raise his head up when he was testifying. Not something that really, in my mind, that's parallel with the truth, something you could expect to see in someone being truthful.

He denies he's getting any credit. But you're the judges. You decide the facts. You don't have to accept his testimony as true when he tells you on four felony convictions he gets one year in jail. Three of which occur a little more than one year within the time frame he's cooperating with the police he gets one year? It's you that decides that. I submit, ladies and gentlemen, not only does he know he was helped out in those cases but he knows being the drug-dealing lowlife that he is that he now has – he can go act with impunity there. He's going to be able to commit more crimes knowing he stepped up to the plate with the Suffolk County Police Department and he said he heard something directly from [petitioner] and was willing to testify about it in court and make it look good but by saying he's not getting ant credit. Currency of criminals. Four strikes you're not out. That's Maurice Bidot.

And you may say to yourselves, Hey, it's his cousin. My cousin wouldn't do that to me. I venture a guess none of your cousins are four-time felony, lowlife drug dealers. I'll venture that guess. You can't make that comparison. Because that's what Mr. Bidot is. And all Mr. Bidot cares about is himself. All Mr. Bidot cares about is his future of drug dealing that he said he's reformed. He wasn't reformed after the first, wasn't reformed after the second, wasn't reformed after the third and you can bet he's not reformed now. He's got credit in the bank. And that bank is Suffolk County law enforcement."

(T6. 35-42)[15].

The prosecutor then made the following comments during her summation:

"Now, first of all, you have the testimony of Maurice Bidot. * * * Maurice Bidot is his cousin. Counsel wants to kind of dismiss that. Ladies and gentlemen, that's family. That's who came in here and testified against this defendant. He calls him a lowlife, drug-dealing person. You know what? He's his buddy. He's his friend –

* * *

And on that date you will recall on January 10, 2005 they spent six hours together. Remember what Detective Mercer told you? It was on two occasions that they attempted to wire him. He's spending time with Maurice Bidot. That's not only

---

[15] References to the transcript of the proceedings on June 5, 2006 are cited as "(T6.)"

his cousin. Clearly, they're friends. They hang out together. So this guy's hanging out with the lowlife drug dealer that [defense counsel] makes such a big deal about.

As you watched that young man testify, you could see it pained him to be here. It pained him to have to testify against a family member and then have to go back to his family and explain why he came in here and did the right thing. It pained him. He hung his head. He was uncomfortable. He looked away. If you remember, you can see – you can see him sitting in that chair right now. He did not want to have to tell you about what his cousin said. He was very uncomfortable and often times hesitated to give you information but he nonetheless did.

Defense counsel wants you to believe he has something to gain from having been here. What did he have to gain? By the time that young man sat in that chair – he has no pending criminal charges, nothing – there's nothing my office or the police department could do for him. Absolutely nothing.

And he continued to be arrested. And you heard from his mouth he was told you're not getting anymore consideration. You have continued to commit crimes and you are not getting anymore consideration. So as he sat in that chair and he told you what his cousin had to say, he was getting nothing. There was no benefit to him whatsoever other than to do the right thing. You also didn't hear any evidence about any motivation in terms of bias or hostility or prior confrontation, bad blood between cousins, none of that. If you recall, Maurice Bidot was never even crossed about the substance of what it was that the [petitioner] told him.

* * *

In any event, ladies and gentlemen, you never heard testimony from Maurice Bidot regarding any bad blood or prior confrontation, any motivation on his part to provide this evidence against the [petitioner] other than that it was the truth.

Yes, he came to the police when he was arrested. And you will recall that in the beginning of December of 2004, that's when he gave his statement indicating that these conversations had taken place in October and November of 2004. That he had about three conversations with the [petitioner], that the [petitioner] told him what happened in CI. That the [petitioner] told him that he was involved in that murder. That he had a gun. That there were two others. I asked him: Did he tell you the names of the two other people? He said no. I didn't know the names. He didn't tell you who the other two people were because that's not the information he received from his cousin. His cousin spoke about himself. The [petitioner] said: I was there. I had the gun. This is what happened. This is what I did. If he was trying to embellish, why didn't he get the other names? Why didn't he tell

you [Santalis] was the driver? He didn't tell you that because the [petitioner] didn't tell him that. Counsel questions the source of his information. If he heard all these rumors, wouldn't he have been able to tell you more? Wouldn't he have given you the names of the other two individuals. He didn't hear rumors. He was sitting in jail. And if you recall his testimony, someone told him: I heard that your cousin was involved in a murder. That was all he knew. Any further details – and you can have his testimony read back – any further details about it came from the [petitioner].

And there was one very, very important piece of information that he provided you. He said that the [petitioner] told him, in part, that one of the guys who did it – and, again, he didn't name him – but one of the guys who did it may actually have had a vendetta against Eric Carter. You know about the allegation of the relationship between [Carter] and [Santalis]. Certainly there was something going on there. How would Maurice Bidot know that if not from the horse's mouth?

And also consider these individuals were not arrested until about six months later. They were all arrested in May of 2005. So none of them had spoken to the police. None of them had told the police what happened. The participants had not spoken to the police. The people who were in the house didn't know their – the names of the individuals that committed the crimes. So where is Maurice Bidot getting his information from if not from his cousin? There's no other way for him to know. He did not get that information when he was in the jail.

And the other thing I want to point out very quickly is counsel keeps saying that early on they knew from [Santalis] that information – that [Santalis] had put that information out there. That she was the one who spoke about what happened. [Santalis]. There's absolutely no testimony whatsoever that [Santalis] ever told the police or anyone else what happened until May of 2005 when she gave up the whole thing, and by the way, gave up herself, the man that she had two children with, William Brewster and the [petitioner] because that's who was involved. There was no other information out there.

And, frankly, if you were one of those four men who committed that crime – the three men and the one woman, you weren't talking about that. You weren't putting information out on the street saying: Oh, I did this. You were confiding in people, in a single person, the [petitioner], to Maurice Bidot, his cousin. That's what makes sense here. There was no other information swirling. There's absolutely nothing in the record to support that. Absolutely nothing.

You'll also remember the testimony of Detective Mercer. He did try to wire the – Maurice Bidot on two separate occasions. Now, he had taken over the investigation. Why is he bothering to do this if not because Maurice Bidot had

come to the police and had provided them with information that they thought was relevant and important to their investigation. So, of course, he would like to verify that on tape, if he could.

And you remember what Detective Mercer told you. The first time there was no information about the murder. The second time was on January 10th of 2005. And you'll remember he brought Maurice Bidot to a house where the [petitioner] had been living with some woman. The house on Mastic Boulevard in Mastic. They spent several hours together. And remember what Detective Mercer told you? He clearly – and he used the word "clearly" – heard a conversation which was significant.

[Defense counsel]: Objection, your Honor. Objection.

[The trial court]: What grounds? Did he testify to that or not?

[Defense counsel]: Your Honor, it was objected to. It was objectionable. Could I have a sidebar?

[The trial court]: Okay

(Whereupon, the following transpired at sidebar:)

[Defense counsel]: I did object to that testimony when it was offered. It was my position, your Honor –

[The trial court]: Was it sustained over [sic] or overruled?

[Defense counsel]: It may have been overruled. I am still objecting to the argument at this point, your Honor, because it – what it does is try to create an inference that he heard my client make an admission. That's an unfair inference. That's not what the evidence showed.

[The trial court]: But –

[Defense counsel]: And why wouldn't he testify if he heard something?

[The prosecutor]: Because that's bolstering and he's not allowed to.

[Defense counsel]: Why is that bolstering if he hears an admission? If he hears an admission he's not going to testify?

54

| | |
|---|---|
| [The prosecutor]: | I was precluded from having the detective testify. I was specifically precluded. |
| [Defense counsel]: | You were asked for an offer of proof. You never told anybody that he heard him say anything. |
| [The prosecutor]: | Did you sit and listen – |
| [The trial court]: | You two guys are talking back and forth. I am involved in this process as well. We are at the sidebar. [The prosecutor] can comment on what the defendant [sic] testified. It was more or less verified, whether you believe it or not, through Bidot because he said, He told me about it. So I wouldn't allow Detective Mercer to testify what he heard. |
| [The prosecutor]: | Right. |
| [The trial court]: | Because that would have been bolstering. I would sustain that but on this point that [the prosecutor] is making now, there was testimony about it. |
| [Defense counsel]: | This isn't bolstering just because he said he heard it when he heard it. He said, Something significant. That's not bolstering. |
| [The trial court]: | We don't know what – [Defense counsel], you're getting out of hand. |
| [Defense counsel]: | I think it's an important enough point to make as clear a record as I can. |
| [The trial court]: | You've had it. It's over. |
| [Defense counsel]: | You just heard what is significant to the investigation means. What is bolstering? What could it mean other than hearing something – |
| [The trial court]: | Get away from that. You're jumping on one word that I said. You're right. Don't do that to me. Don't do that to me. You're right. The point is that he testified to that. |
| [Defense counsel]: | It was objected to. |

55

| [The trial court]: | It was overruled. So it's before the jury. She can call attention to it. |
| --- | --- |
| [Defense counsel]: | But your Honor just indicated to me that – |
| [The trial court]: | I didn't allow – |
| [Defense counsel]: | What does significant mean to me? That is bolstering. It's the same thing as saying he heard it. It's the same thing. It's just trying to get around it. It has the same effect on a jury. And if that's not bolstering, what is? And she is going to be allowed to comment on it? |
| [The trial court]: | I didn't allow him to testify as to the content of what he heard because that would have been bolstering. |
| [Defense counsel]: | But saying it's a significant conversation to the investigation – |
| [The trial court]: | You made your record up and down and sideways. |
| [Defense counsel]: | I am moving for a mistrial at this point. |
| [The trial court]: | It's denied. |
| [Defense counsel]: | Fine. |
| [The trial court]: | You'll lose credibility on motion for mistrial if you do that. Let's go. |
| [Defense counsel]: | Your Honor. Your Honor – |

(Whereupon, the following transpired in open court:)

| [The prosecutor]: | May I continue, your Honor? |
| --- | --- |
| [The trial court]: | Please. |
| [The prosecutor]: | Thank you. |

Ladies and gentlemen, Detective Mercer told you about having heard a conversation that was significant to his investigation on January 10, 2005 when he monitored the conversations between Maurice Bidot and the defendant,

[petitioner]. He said that he could hear the conversation clearly. Maurice Bidot came in here and told you what that conversation was. And in the course of that conversation, the [petitioner] --

| | |
|---|---|
| [Defense counsel]: | Objection, your Honor. That is also a misstatement of the facts. He never testified to that particular conversation. |
| [The prosecutor]: | He testified to a conversation January 10th of 2005 [sic]. |
| [The trial court]: | Go ahead. Overruled. |
| [The prosecutor]: | Thank you, your Honor. |

Maurice Bidot testified to a conversation back on January 10th of 2005 and he told you that in the course of that conversation the [petitioner], again, discussed what he had done when they went into that house in CI. Maurice Bidot only knew it was a house in CI because the [petitioner] told him that. Maurice Bidot only knew who was present when it happened because the [petitioner] told him that. And he also only knew that the [petitioner] had a gun that didn't have any bullets in it and that there was blood all over the place because that's what the [petitioner] told him back on January 10th of 2005 when Detective Mercer was monitoring the conversations.

And that is corroborated by the photographs that – you saw the condition of that house. How would Maurice Bidot know that there was blood all over the areas where this confrontation took place (Showing)? Robert Arbaiza's blood and Eric Carter's blood all over the areas where this confrontation took place. How would Maurice Bidot know any of that? The blood on the wall and the bed where they beat and ultimately stabbed Eric Carter, how would Maurice Bidot know any of that? On the door as you're exiting the house. On the walls. Those walls as the confrontation went outside. That there was blood all over the place. How would Maurice Bidot know any of that? Maurice Bidot, as you saw, he's not a very articulate young man but he was forthright.

You'll remember his cross-examination when he was asked about: Were you a drug dealer? Yes, sir. Not just yes. Yes, sir. Were you convicted of possessing marijuana? Yes, sir, I was. He was forthright. He was direct. Was he uncomfortable to be saying what it was that his cousin told him in October and November of 2004 and then again in January of 2005? Yes, he was. And, remember, it was a family member.

But, ladies and gentlemen, number one, it happened before any of this took place. Before Wanda Santalis ever went to the police and admitted what happened here.

And there's absolutely no evidence of any animosity, hostility, bias, bad blood, anything between Maurice Bidot and [petitioner]. And as he sat here and testified last week, he's getting absolutely nothing for that. He has nothing pending. There is nothing to gain. Absolutely nothing.

Counsel commented on the tapes, that you don't have the tapes. You're not permitted to hear tapes --

* * * [After defense counsel objected, the prosecutor was told to "move on to something else * * *."]

Counsel suggests that there's a problem with the tapes because Mr. Bidot wasn't wired again. Ladies and gentlemen, how many times are you going to try and have somebody like Mr. Bidot go back out and try and talk to his cousin about a murder? They sent him out there on two different occasions. Hours at a time. And Detective Mercer told you there was only that one significant conversation. It was on January 10th and it was of less than five minutes in duration. How many times are you going to send someone into harm's way, an individual like Maurice Bidot, and wire him up and see if he can talk to this person about a murder? How many times do you put somebody in harm's way like that? You don't.

The tapes were not of the best quality. Detective Mercer explained to you why that happens. It's clothing. He said in this case there was a lot of background noise. There are reasons for that. But they've done it in the past. They will continue to do it in the future. And Maurice Bidot, it's not like it's [sic] an undercover police officer who's trained how to wear a wire, how to go out and speak to people.

Again, picture the young man you saw on the stand. It was June 1st and he was wearing thermal underwear and a vest over it, a down vest over it. You can imagine the clothing he was wearing in January 2005.

* * *

Counsel has also mocked the fact Mr. Bidot only got one year for those charges that were pending against him. Ladies and gentlemen, plea bargains are struck in every courtroom in this country every day of the week. Defense attorneys like [defense counsel] make deals for their clients every single day of the week. That's what happened in Mr. Bidot's case, clearly. And if we didn't do that and if that's not the way the system worked, can you imagine if we went through this type of process and trial with respect to every single defendant who passed through the door? The criminal justice system couldn't survive. It happens every single day of the week.

The bottom line, there's no evidence of any hostility or bias. There's no evidence of any reason for Mr. Bidot to come in here but for the fact that he was telling you the truth about what he heard from his cousin."

(T6. 59-78).

In reviewing a claim of prosecutorial misconduct in the context of state criminal proceedings, the appropriate standard of review by a federal habeas court is "the narrow one of due process, and not the broad exercise of supervisory power that it would possess in regard to its own trial court." Donnelly v. DeChristoforo, 416 U.S. 637, 642, 94 S. Ct. 1868, 40 L. Ed. 2d 431 (1974) (parentheses and quotations omitted). "[N]ot every trial error or infirmity which might call for application of supervisory powers correspondingly constitutes a failure to observe that fundamental fairness essential to the very concept of justice." Id. (quotations and citation omitted). Federal habeas courts must distinguish "between ordinary trial error of a prosecutor and th[e] sort of egregious misconduct * * * [that] amount[s] to a denial of constitutional due process." Id. at 647-48, 94 S. Ct. 1868.

With respect to a prosecutor's purported improper statements during summation, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned." Darden v. Wainwright, 477 U.S. 168, 180-81, 106 S. Ct. 2464, 91 L. Ed. 2d 144 (1986) (quotations and citation omitted). "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Id. at 181, 106 S. Ct. 2464 (quotations and citation omitted); see also Tankleff v. Senkowski, 135 F.3d 235, 252 (2d Cir. 1998) (holding that in order to grant habeas relief, the court must "find that the prosecutor's comments constituted more than mere trial error, and were instead so egregious as to violate the defendant's due process rights.") "A prosecutor's improper summation results in a

59

denial of due process when the improper statements cause substantial prejudice to the defendant." Bradley v. Meachum, 918 F.2d 338, 343 (2d Cir. 1990) (quoting United States v. Modica, 663 F.2d 1173, 1181 (2d Cir. 1981)). The petitioner "must show that he suffered actual prejudice because the prosecutor's comments during summation had a substantial and injurious effect or influence in determining the jury's verdict." Tankleff, 135 F.3d at 252 (quotations and citation omitted). "In determining whether [a prosecutor's] misconduct amounted to substantial prejudice, [courts] examine the severity of the misconduct; the measures adopted to cure the misconduct; and the certainty of conviction absent the improper statements." Bradley, 918 F.2d at 343 (quotations and citation omitted); see also Tankleff, 135 F.3d at 252.

Initially, the prosecutor's references to Mercer's testimony during her comments about Bidot's testimony were not improper since they constituted fair comment upon the evidence presented during the trial and were responsive to the comments made by defense counsel about Bidot's testimony during his summation.

Even if improper, however, the prosecutor's misconduct did not permeate the trial; her argument "did not manipulate or misstate the evidence, nor did it implicate other specific rights of the accused such as the right to counsel or the right to remain silent," Darden, 477 U.S. at 182, 106 S. Ct. 2464; see also Donnelly, 416 U.S. at 643, 94 S. Ct. 1868 ("When specific guarantees of the Bill of Rights are involved, th[e] [Supreme] Court has taken special care to assure that prosecutorial conduct in no way impermissibly infringes them."); the jurors were instructed that their decision was to be made on the basis of the evidence alone, (T6. 103-04), and that the statements of counsel were not evidence, (T6. 104); "[t]he cumulative effect of the challenged statements * * * was not so inflammatory or egregious as to require a finding of substantial

prejudice," Bradley, 918 F.2d at 343; and "[t]he clear evidence of [petitioner's] guilt demonstrates that [he] was not prejudiced by the prosecutor's improper remarks." Id. In short, the challenged comments by the prosecutor did not render petitioner's trial "so fundamentally unfair as to deny him due process." Donnelly, 416 U.S. at 645, 94 S. Ct. 1868. Since any impropriety of the prosecutor's comments during summation "did not undermine the integrity of the trial and result in a denial of due process," Bradley, 918 F.2d at 344, so much of petitioner's "bolstering" claim as challenges the prosecutor's comments during summation is denied.

### 2. Legal Insufficiency Claim

Petitioner contends that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt because the testimony of his accomplice, Santalis, was insufficiently corroborated.

"[T]here is no absolute rule of [federal] law preventing convictions on the testimony of accomplices if juries believe them." Caminetti v. U.S., 242 U.S. 470, 495, 37 S. Ct. 192, 61 L. Ed. 442 (1917). "The testimony of a single accomplice is sufficient to sustain a conviction so long as that testimony is not incredible on its face and is capable of establishing guilt beyond a reasonable doubt." United States v. Hamilton, 334 F.3d 170, 179 (2d Cir. 2003) (quoting United States v. Gordon, 987 F.2d 902, 906 (2d Cir. 1993)); see also United States v. Diaz, 176 F.3d 52, 92 (2d Cir. 1999). "Any lack of corroboration goes only to the weight of the evidence, not to its sufficiency," Hamilton, 334 F.3d at 179, which is a matter for the jury. See id.

Since petitioner's claim that Santalis's testimony was not sufficiently corroborated raises an issue of state law only that is not cognizable on federal habeas review, see, e.g. Young v.

McGinnis, 319 Fed. Appx. 12, 13 (2d Cir. Mar. 27, 2009) (summary order) (holding that regardless of whether there was a violation of state law in failing to give an accomplice-corroboration instruction, "there was no violation of federal law, let alone of any federal constitutional right."); U.S. v. Elusma, 849 F.2d 76, 79 (2d Cir. 1988) ("An accomplice's testimony * * * need not be corroborated to establish guilt."); Kirkby v. Filion, 644 F. Supp. 2d 299, 306-07 (W.D.N.Y. 2009) (dismissing the petitioner's claim that the evidence was legally insufficient because the accomplice testimony was not sufficiently corroborated because it "does not present a viable basis for habeas relief."); Gaiter v. Lord, 917 F. Supp. 145, 150 (E.D.N.Y. 1996) (holding that a claim regarding the failure to give an accomplice-corroboration charge is not cognizable on federal habeas corpus review), petitioner's claim (Ground Four) is dismissed.

In any event, petitioner's contention that the evidence was legally insufficient to establish his guilt beyond a reasonable doubt because Santalis's testimony was not sufficiently corroborated is without merit.

The Appellate Division held that upon "[v]iewing the evidence in the light most favorable to the prosecution," the evidence "was legally sufficient to establish the defendant's guilt beyond a reasonable doubt," People v. Bryson, 66 A.D.3d at 917, 887 N.Y.S.2d 263, and that "[i]ndependent evidence sufficiently corroborated the accomplice testimony which Santalis provided at trial." People v. Bryson, 66 A.D.3d at 917, 887 N.Y.S.2d 263.

When considering the legal sufficiency of the evidence, the court "must look to state law to determine the elements of the crime," Gutierrez v. Smith, 702 F.3d 103, 113 (2d. Cir. 2012) (quoting Fama v. Comm'r of Corr. Servs., 235 F.3d 804, 811 (2d Cir 2000)), and determine "whether, after viewing the evidence in light most favorable to the prosecution, *any* rational trier

of fact could have found the essential elements of the crime beyond reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319, 99 S. Ct 2781, 61 L. Ed. 2d 560 (1979) (emphasis in original); see also Cavazos v. Smith, 565 U.S. 1, —, 132 S. Ct. 2, 6, 181 L. Ed. 2d 311 (2011). "[A] reviewing court 'faced with a record of historical facts that supports conflicting inferences must presume—even if it does not affirmatively appear in the record—that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" Cavazos, —U.S. —, 132 S. Ct. 6 (quoting Jackson, 443 U.S. at 326, 99 S. Ct 2781).

In Coleman v. Johnson, — U. S. —, 132 S. Ct. 2060, 182 L. Ed. 2d 978 (2012), the Supreme Court held that legal insufficiency claims:

> "face a high bar in federal habeas proceedings because they are subject to two layers of judicial deference. First, on direct appeal, 'it is the responsibility of the jury– not the court– to decide what conclusions should be drawn from evidence admitted at trial. A reviewing court may set aside the jury's verdict on the ground of insufficient evidence only if no rational trier of fact could have agreed with the jury.' Cavazos v. Smith, 565 U.S. 1, —, 132 S. Ct. 2, 4, 181 L. Ed. 2d 311 (2011) (*per curiam*). And second, on habeas review, 'a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge simply because the federal court disagrees with the state court. The federal court instead may do so only if the state court decision was "objectively unreasonable."'" Ibid. (quoting Renico v. Lett, 559 U.S. 766, —. 130 S. Ct. 1855, 1862, 176 L. Ed. 2d 678 (2010))."

Id. at 2062. Thus, although state law determines the substantive elements of the criminal offense, "the minimum amount of evidence that the Due Process Clause requires to prove the offense is purely a matter of federal law." Coleman, 132 S. Ct. at 2064. "Jackson leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" Id. (quoting Jackson, 443 U.S. at 319, 99 S. Ct. 2781). "[T]he only question under Jackson is whether [the jury's]

finding was so insupportable as to fall below the threshold of bare rationality." Id. at 2065. A

determination of the state court of last review that the evidence was legally sufficient to establish

the defendant's guilt beyond a reasonable doubt "is entitled to considerable deference under

AEDPA, 28 U.S.C. § 2254(d)." Id.

Under New York law at the time of the offense for which petitioner was convicted, a

person was guilty of murder in the second degree, in relevant part:

> "when: * * * 3. Acting either alone or with one or more other persons, he commits
> or attempts to commit * * * burglary, * * * and, in the course of and in
> furtherance of such crime or of immediate flight therefrom, he, or another
> participant, if there be any, causes the death of a person other than one of the
> participants * * *."

(N.Y. Penal Law §125.25(3) (felony murder)).

Under New York law, a person is guilty of burglary in the first degree, in relevant part:

> "When he knowingly enters * * * a dwelling with intent to commit a crime
> therein, and when, in effecting entry or while in the dwelling or in immediate
> flight therefrom, he or another participant in the crime: * * * 2. Causes physical
> injury to any person who is not a participant in the crime; or 3. Uses or threatens
> the immediate use of a dangerous instrument * * *."

(N.Y. Penal Law § 140.30(2) and (3)).

There is sufficient evidence in the record from which a rational jury could have found

petitioner guilty of murder in the second degree under New York law, i.e.: (1) that petitioner,

acting with two (2) other men, committed the crime of burglary in the first degree by (a)

knowingly entering Carter's house with the intent to rob him, (b) causing Carter and Arbaiza

physical injury and (c) threatening the occupants of Carter's house with the immediate use of

dangerous instruments; (2) that Carter's death was caused in the course of, and in furtherance of,

the crime of burglary in the first degree; (3) that Carter was not a participant in the crime of

burglary in the first degree; and (4) that petitioner was over the age of eighteen (18) years at the time he committed the crime. Specifically, *inter alia*, Santalis testified regarding (a) petitioner's planning of the burglary with Williams and Brewster, (b) the weapons the three (3) men brought to Carter's house and (c) their flight from the scene, and her testimony was not incredible on its face. Moreover, Santalis's testimony was corroborated in part by, *inter alia*,: (1) the testimony of Bidot and Glover regarding petitioner's statements to them about his participation in the crime with two (2) other men; (2) the fairly consistent testimony of Arbaiza, Dudley and Ventura regarding the perpetrators' weapons and clothing; and (3) the testimony of Tracy and Galdi regarding the baseball cap collected at the scene and the finding of Williams's DNA thereon. The following additional evidence also established petitioner's guilt beyond a reasonable doubt: (1) the fairly consistent testimony of Arbaiza, Dudley and Ventura regarding the commission of the crimes and the descriptions of the men who entered Carter's house; (2) the testimony of Abramowitz, Connors and Degennaro regarding their observations at the scene during their investigation, which corroborated the testimony of Arbaiza, Dudley and Ventura regarding what had occurred; (3) the testimony of Tracy and Galdi regarding the evidence collected at the scene, which further corroborated the testimony of Arbaiza, Dudley and Ventura regarding what had occurred; and (4) Wilson's testimony regarding the wounds he observed during the autopsy of Carter, which corroborated the testimony of Arbaiza, Dudley and Ventura that they saw Carter being hit with a gun in the face and head and with a bat and being stabbed. Accordingly, the Appellate Division's finding that the evidence was legally sufficient to establish petitioner's guilt beyond a reasonable doubt was not contrary to, or an unreasonable application of, clearly established federal law, nor was it based upon an unreasonable determination of the facts in light

of the evidence presented in the State court proceeding. Therefore, petitioner's legal insufficiency claim (Ground Four) is denied.

IV.    Conclusion

For the reasons set forth above, the petition for a writ of habeas corpus is denied and the proceeding is dismissed in its entirety. As petitioner has failed to make a substantial showing of a violation of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. §2253(c)(1); see also Miller-El v. Cockrell, 537 U.S. 322, 336, 123 S. Ct. 1029, 154 L. Ed. 2d 931 (2003); Contino v. United States, 535 F.3d 124, 127 (2d Cir. 2008). Petitioner has a right to seek a certificate of appealability from the United States Court of Appeals for the Second Circuit. See 28 U.S.C. § 2253.

The Clerk of the Court shall enter judgment in favor of respondent, close this case, and serve notice of entry of this Order on all parties in accordance with Rule 77(d)(1) of the Federal Rules of Civil Procedure.

SO ORDERED.

s/ Sandra J. Feuerstein

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: Central Islip, New York
         October 1, 2013